Robert B. Blackburn (RB-1545)
Associate Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
Seven World Trade Center, 13th Floor
New York, New York 10048
212-748-8035
212-748-8049 (facsimile)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

              v.

GRANT R. CURTIS, LEO MANGAN, TIMOTHY H.
MASLEY, JAMES W. NEAREN, RAIMOND IRNI,
PEDRO DIBRITO GOMEZ, DONALD E.
KESSLER, DAVID R. BEHANNA, ANDREA VARSI,
JONATHAN D. LYONS, KENNETH A. ORR,
LILLIAN M. VINCI, ANN MARIE NOEL,
MICHAEL V. LIPKIN, JOSHUA S. SHAINBERG,
PHILLIP J. MILLIGAN, AND ROBERT L. SHATLES,

                              Defendants.

---

CV 99 Civ. 7357

COMPLAINT
AND
JURY DEMAND

GERSHON, J.



---

Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint

against Grant R. Curtis ("Curtis"), Leo Mangan ("Mangan"), Timothy H. Masley ("Masley"),

James W. Nearen ("Nearen"), Raimond Irni ("Irni"), Pedro DiBrito Gomez ("Gomez"),

Donald E. Kessler ("Kessler"), David R. Behanna ("Behanna"), Andrea Varsi ("Varsi"),

Jonathan D. Lyons ("Lyons"), Kenneth A. Orr ("Orr"), Lillian M. Vinci ("Vinci"), Ann Marie

Noel ("Noel"), Michael V. Lipkin ("Lipkin"), Joshua S. Shainberg ("Shainberg"), Phillip J.

GRAUBARD DECL. EX. 1                                    SEC001



Milligan ("Milligan"), and Robert L. Shatles ("Shatles") (collectively, the "Defendants"), alleges that:

## NATURE OF THE ACTION

1.    This case arises from a fraudulent scheme to illegally retail stock at inflated prices by Curtis, Mangan and Masley, who masterminded the fraud and shared the proceeds pursuant to an unwritten partnership agreement. From at least 1994 through 1996, Curtis, Mangan and Masley exercised undisclosed control over three public companies, Windswept Environmental Group, Inc. ("Windswept"), ICIS Management Group, Inc. ("ICIS") and Pilot Transport, Inc. ("Pilot") (together "the Issuers"). Using that control, Curtis, Mangan and Masley caused the Issuers to issue more than eight million shares of stock -- in most cases for little or no consideration -- to various nominees, and then caused over five million shares of that stock, all of which was unregistered or improperly registered, to be sold to the public. This scheme generated illicit proceeds of more than $8 million.

2.    Nearen, Irni and Gomez assisted Curtis, Mangan and Masley in this scheme. Nearen prepared false and misleading public filings and acted as legal counsel to Curtis, Mangan and Masley. Irni and Gomez participated in the scheme by acting as a conduit and disposing of the fraudulently issued stock using phony foreign corporations, paying undisclosed compensation to brokers and buying and selling stock in foreign and domestic brokerage accounts, usually through the use of nominees.

3.    Kessler, Behanna and Varsi furthered the fraud by concealing Curtis', Mangan's and Masley's control of the Issuers, by signing documents authorizing the issuance of stock to nominees and by signing false and misleading public filings.

**GRAUBARD DECL. EX. 1**              2                    **SEC002**

4.    Lipkin, Shainberg, Orr, Lyons, Vinci, Noel, Milligan, and Shatles were paid undisclosed kickbacks for selling the fraudulently obtained stock to the public.

## VIOLATIONS

5.    Curtis, Mangan, and Masley, directly or indirectly, singly or in concert, have engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a); Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78m(d); Rules 10b-5 and 13d-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13d-1; and Rules 13b2-1 and 13b2-2 promulgated under Section 13(b) of the Exchange Act, 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2; and violations by Windswept and ICIS of Sections 13(a) and 13(b) of the Exchange Act, 15 U.S.C. §§ 78m(a) and 78m(b); and Rules 12b-20, 13a-1 and 13a-13, thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13, for which Curtis, Mangan and Masley are liable as controlling persons pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

6.    Nearen, directly or indirectly, singly or in concert, has engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Sections 5(a), 5(c) and 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rules 13b2-1 and 13b2-2 promulgated under Section 13(b) of the Exchange Act; and violations by ICIS of Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, for which Nearen is liable as a controlling person pursuant to Section 20(a) of the Exchange Act.

7.      Kessler, directly or indirectly, singly or in concert, has engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Sections 5(a), 5(c) and 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Rules 13b2-1 and 13b2-2 promulgated under Section 13(b) of the Exchange Act; and violations by Windswept of Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, for which Kessler is liable as a controlling person pursuant to Section 20(a) of the Exchange Act.

8.      Irni and Gomez, directly or indirectly, singly or in concert, have engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

9.      Behanna, directly or indirectly, singly or in concert, has engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Rules 13b2-1 and 13b2-2 promulgated under Section 13(b) of the Exchange Act; and violations by Windswept of Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, for which Behanna is liable as a controlling person pursuant to Section 20(a) of the Exchange Act.

10.     Varsi, directly or indirectly, singly or in concert, has engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Rules 13b2-1 and 13b2-2 promulgated under Section 13(b) of the Exchange Act;

and violations by Windswept of Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder, for which Varsi is liable as a controlling person pursuant to Section 20(a) of the Exchange Act.

11.    Milligan, Lipkin, Shainberg, Shatles, Lyons, Orr, Vinci and Noel, directly or indirectly, singly or in concert, have engaged and, unless enjoined, will engage in transactions, acts, practices or courses of business that constitute, and would constitute, violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## JURISDICTION

12.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), seeking:

  a)  that each of the Defendants be enjoined from engaging in the transactions, acts, practices and courses of conduct alleged herein;

  b)  a judgment requiring Curtis, Mangan, Masley, Nearen, Irni, Gomez, Kessler, Milligan, Lipkin, Shainberg, Shatles, Lyons, Orr, Vinci and Noel to disgorge their ill-gotten gains, plus prejudgment interest thereon;

  c)  an order barring Curtis, Mangan, Masley, Nearen and Kessler from serving as officers or directors of a public company pursuant to Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act;

  d)  the imposition of civil penalties against each of the Defendants pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act;

e)  an order requiring the Defendants to provide an accounting; and

f)  such other and further relief that the Court may deem appropriate.

13.  This Court has jurisdiction over this action pursuant to Sections 20(d), 20(e) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d), 77t(e) and 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

14.  The Defendants, directly and indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Certain of the transactions, acts, practices and courses of business alleged herein took place within the Eastern District of New York, including, but not limited to, all issuances of Windswept common stock.

## THE ISSUERS

15.  Windswept is a Delaware corporation which was known as Comprehensive Environmental Systems, Inc. from February 1995 through April 1997 and as Integrated Resource Technologies, Inc. from June 1993 through February 1995.  Windswept is in the business of waste remediation and is headquartered in Bay Shore, New York.  Since September 1987, Windswept's common stock has been registered with the Commission pursuant to Section 12(g) of the Exchange Act, 15 U.S.C. and it was listed on the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), until it was delisted on October 22, 1996. For its fiscal year ending April 30, 1999, Windswept reported assets of $5.7 million, revenues of $13.9 million, and negative earnings per share of $0.11.  As of April 30, 1999 Windswept had 14,135,073 common shares outstanding.

16.    ICIS, known as Alter Sales until 1995, was incorporated and based in Florida and its

principal business was the retail sale of auto parts. Curtis, Mangan and Masley obtained control

of ICIS in late 1994 and used it as a vehicle for acquiring other companies. ICIS' common stock

was registered with the Commission pursuant to Section 12(g) of the Exchange Act, and it was

listed on NASDAQ until it was delisted in October 1996. ICIS currently has no available price

quote and has not filed any periodic reports with the Commission since September 1996. For its

fiscal year ending December 31, 1995, ICIS reported 6,035,000 shares outstanding, assets of $6.9

million, liabilities of $2.1 million and negative earnings per share of $1.44.

17.    Pilot was a Nevada corporation and it shared a corporate address with ICIS. Pilot's only

operating facility was Cierra Gaming Systems, Inc., which was located in Montreal and produced

a video lottery terminal. Pilot had no revenues and its only source of funds was from private

placements of stock. Pilot ceased operating in approximately November 1995. Pilot common

stock was quoted on the OTCBB until late 1996. Pilot's transfer records indicate that it had

more than 300 shareholders. The State of Nevada revoked Pilot's corporate status in 1997 and

Pilot stock does not appear to be actively trading.

## DEFENDANTS

18.    Curtis, age 39, was an undisclosed control person of ICIS, Windswept and Pilot. He was

convicted of federal bank fraud in the United States District Court for the Northern District of

Texas in 1994. In 1997, Curtis entered a guilty plea in the United States District Court for the

Eastern District of New York and was convicted of one count of conspiracy to commit securities

fraud and two counts of securities fraud, arising from and related to the conduct which is the

subject of this Complaint. On May 5, 1998, Curtis was sentenced to 51 months incarceration and

three years supervised probation. United States v. Grant R. Curtis, et al., 96 Cr. 874 (E.D.N.Y.).

Curtis resided in the United States at all times relevant to this Complaint.

19.     Mangan, age 43, was an undisclosed control person of ICIS and Pilot. From May 1993

through September 1996, Mangan served as chief operating officer and a director of Windswept.

In 1979, Mangan was convicted of cocaine distribution and served almost four years in a federal

prison. In 1991, Mangan was again arrested and pleaded guilty to a federal charge of cocaine

distribution, for which he was sentenced to 48 months imprisonment. Mangan resided in the

United States at all times relevant to this Complaint.

20.     ·Masley, age 38, was an undisclosed control person of ICIS, Windswept and Pilot.

Masley resided in the United States at all times relevant to this Complaint.

21.     Nearen, age 45, was a staff attorney with the Commission's Central Regional Office for

seven years before leaving in 1995. Nearen served as a director of ICIS from September 7, 1995

through September 1996, as president of ICIS from January 1996 through September 1996, as

president and a director of Pilot from September 1995 through approximately November 1995,

and as a director of Windswept from March 1996 through September 1996. In 1997, Nearen

entered a guilty plea in the United States District Court for the Eastern District of New York and

was convicted of the felonies of securities fraud, conflict of interest by a former government

employee and money laundering, arising from and related to the conduct which is the subject of

this Complaint. On January 22, 1998, he was sentenced to eighteen months incarceration and

three years probation. United States v. James W. Nearen, 96 Cr. 874 (E.D.N.Y.).

22.     Irni, age 48, resided in the United States at all times relevant to this Complaint.

23.    Gomez, age 40, was the president of Pilot from June 1994 until in or about November 1994. Gomez resided in the United States at all times relevant to this Complaint.

24.    Behanna, age 41, is a certified public accountant and served as Windswept's Chief Financial Officer and a director from February 1995 through September 1997. Prior to working for Windswept, Behanna was a principal in the accounting firm of Behanna & Oliva, which was Windswept's independent auditor for its fiscal year ending April 30, 1994. Behana resides on Long Island, New York.

25.    Kessler, age 55, was a director, the president, chairman of the board and chief executive officer of Windswept from March 1995 through September 1996. He also served as a director of ICIS from September 1995 through November 1996. Kessler resides in Deer Park, New York.

26.    Varsi, age 42, was the president of Windswept from December 1993 through February 1995. Varsi resides in New Jersey.

27.    Lyons, age 37, was, from March 1994 through June 1995, a registered principal at First Cambridge Securities Corp. ("First Cambridge"), a broker-dealer formerly registered with the Commission. First Cambridge was known as J.J. Morgan & Co. during the time period relevant to this Complaint.

28.    Orr, age 34, was a registered principal and president of First Cambridge from March 1994 until May 23, 1997.

29.    Vinci, age 31, was a registered representative of First Cambridge from July 1994 through June 1995.

30.    Noel, age 34, was employed by First Cambridge from July 1994 through June 1995. She was a registered representative from April 1995 through June 1995 and prior to that was a "cold-caller."

31.    Lipkin, age 52, was from August 1994 through October 1995 a registered principal and 50 percent owner of Hubert-Rosche Securities Corporation ("Hubert-Rosche"), a branch of Securities Planners, Inc. ("Securities Planners"), a broker-dealer formerly registered with the Commission.

32.    Shainberg, age 43, was from August 1994 through October 1995 a registered principal and 50 percent owner of Hubert-Rosche.

33.    Shatles, age 31, has been a registered representative of Redstone Securities, a broker-dealer registered with the Commission, in Plainview, New York since November 1997. Prior to that, he was a registered principal and 80 percent owner of S.D. Cohn & Co., Inc. ("S.D. Cohn"), a broker-dealer registered with the Commission.

34.    Milligan, age 35, was a registered principal and president of J.P. Milligan & Co., Inc. ("J.P. Milligan"), a broker-dealer registered with the Commission and located in New York City. Milligan sold J.P. Milligan in early 1997.

35.    At all times relevant hereto, Curtis, Mangan and Masley were controlling persons of Windswept, ICIS and Pilot. Among other things, Curtis, Mangan and Masley possessed, directly or indirectly, the power to direct or control, or cause the direction or control of, and directed or controlled, the management and policies of Windswept, ICIS and Pilot.

## FACTS

**BACKGROUND**

36.    From 1994 through 1996, Curtis, Mangan and Masley acted as a partnership and together exercised undisclosed control over Windswept, ICIS and Pilot. Curtis, Mangan, and Masley worked together to use Windswept, ICIS and Pilot for their own personal gain and shared equally in the proceeds of their illegal conduct. Curtis, Mangan and Masley had a general awareness, if not specific knowledge, of what the other defendants in this action were doing with respect to the Issuers and the Issuers' stock.

37.    At all times relevant to this Complaint, Nearen, Irni, Gomez, Kessler, Behanna and Varsi each acted at the direction of Curtis, Mangan and Masley.

**WINDSWEPT**

Background

38.    From at least 1994 through 1996, Curtis, Mangan and Masley controlled all aspects of the business affairs of Windswept, including the ability to cause Windswept to issue stock and the ability to appoint Windswept's officers and directors.

39.    In a series of transactions from at least 1994 through 1996, Curtis, Mangan and Masley and, in at least one instance, Kessler, caused Windswept to issue an aggregate of over 4 million shares of common stock to various foreign shell companies.

40.    The foreign shell companies referenced in Paragraph 39, above, include Rang Tuck Morgan, Ltd. ("Rang Tuck") and Sampson Leasing, Ltd. ("Sampson Leasing"), Venezuelan corporations of which Gomez was president; Piedmont Securities, Ltd. ("Piedmont"), an Irish shell corporation of which, for a time, Irni was president; Abet Investments, Ltd. ("Abet"), a

Bahamian corporation; Hersilia Investments, Ltd., a British Virgin Islands corporation; and

Broadcast Communications, Inc. ("Broadcast Communications"), a Liberian corporation.

Curtis, Mangan and Masley controlled each of these companies except Broadcast

Communications, which was controlled by Kessler.

41.    When Curtis, Mangan and Masley wanted Windswept to issue stock, Mangan would draft

a board resolution authorizing the issuance and would then direct Varsi, Behanna and/or Kessler

to sign the resolution. Mangan would then direct Varsi, Behanna or Kessler to provide written

authorization to Windswept's transfer agent to issue the stock.

42.    Over 3.4 million shares of the 4 million shares of Windswept stock issued to the foreign

shell companies described above in Paragraph 40 was sold to the public for over $5 million, as

more specifically described below in Paragraphs 43 through 103.

200,000 Share Issuance to Abet

43.    Form S-8 is a short form registration statement that may be used to register shares issued

by a company to its employees pursuant to an employee benefit plan. The term "employee

benefit plan" includes option purchase plans offered to consultants and advisors who render bona

fide services to the company. 17 C.F.R. § 230.405.

44.    On July 14, 1994, Windswept filed with the Commission a Form S-8 registration

statement, signed by Varsi, that purported to register 605,000 shares of Windswept common

stock. According to the Form S-8, 200,000 of the shares were to be issued pursuant to an option

Windswept was granting to Abet, purportedly in exchange for services performed for the

company. The option gave Abet the right to purchase 200,000 shares of Windswept stock for $5

per share.

45.    On July 20, 1994, Varsi, at Mangan's direction, caused Windswept to issue 200,000 shares of Windswept common stock to Abet.

46.    Abet was controlled by, and for the benefit of, Curtis, Mangan and Masley.

47.    Abet, a non-operational Venezuelan shell company, never performed any services for Windswept. Further, Abet never paid for the stock issued to it.

48.    Curtis, Mangan and Masley never intended to have Abet provide Windswept with consideration for the stock issued to Abet.

49.    Curtis, Mangan and Masley knew, or were at least reckless in not knowing, that Abet did not perform any services for Windswept and that they controlled Abet.

50.    Varsi knew, or was at least reckless in not knowing, that Abet did not perform any services for Windswept and that Abet was controlled by Curtis, Mangan, and Masley.

51.    The stock issued to Abet was deposited into two accounts controlled by Curtis, Mangan and Masley at Canaccord Capital Corporation ("Canaccord"), a brokerage firm in Vancouver, British Columbia.

52.    At the direction of Curtis, Mangan and/or Masley, this stock was sold to United States investors, at an average of $1.95 per share, for proceeds of at least $389,000.

53.    The Windswept Form S-8, filed on July 14, 1994, falsely stated:

   a)    that the registered shares are "issuable upon exercise of outstanding stock options issued by the Company under its Non-Qualifying Stock option Plan to non-employees, directors, and other persons associated with the Company *whose services have benefitted the Company*" (emphasis added); and

   b)    that Windswept would receive the proceeds if the options were exercised.

54.    These statements were false, since Abet performed no services for Windswept and 200,000 shares of Windswept stock were issued to Abet without consideration.

55.    These shares did not qualify for registration on Form S-8 because no bona fide services were rendered to Windswept. The misstatements in Windswept's Form S-8 were material and Windswept did not subsequently file any corrective disclosure.

500,000 Share Issuance to Sampson Leasing

56.    Regulation S provides a safe harbor exemption from the registration requirements of the Securities Act for offers and sales of securities to foreign persons that occur outside the United States. 17 C.F.R. § 230.901 *et. seq.*

57.    On August 24, 1994, Varsi, acting at the direction of Mangan, caused Windswept to issue 500,000 shares of stock to Sampson Leasing.

58.    This stock was issued to Sampson Leasing in purported compliance with the Regulation S safe harbor.

59.    Sampson Leasing was a Venezuelan shell company. Although Gomez was Sampson Leasing's president, Sampson Leasing was actually controlled by, and for the benefit of, Curtis, Mangan and Masley.

60.    According to the board resolution authorizing the issuance to Sampson Leasing, which Varsi signed, this stock was issued by Windswept as compensation to Sampson Leasing for the purported sale of equipment to a subsidiary of Windswept, Trade-Winds Environmental Restoration, Inc. ("Trade-Winds").

61.    Sampson Leasing never sold or otherwise provided equipment to Trade-Winds, nor did it pay any other consideration for the stock.

62.    Curtis, Mangan, Masley and/or Varsi, directly or indirectly, provided the corporate resolution to Windswept's independent auditors.

63.    Curtis, Mangan and Masley knew, or were at least reckless in not knowing, that Sampson Leasing did not sell equipment to Trade-Winds and that they controlled Sampson Leasing.

64.    Varsi knew, or was at least reckless in not knowing, that Sampson Leasing did not sell equipment to Trade-Winds and that Sampson Leasing was controlled by Curtis, Mangan, and Masley.

65.    In October 1994, Gomez deposited 300,000 shares of the Windswept stock issued to Sampson Leasing into Abet's account at Canaccord and the remaining 200,000 shares into Sampson Leasing's account at J.W. Charles Clearing Corporation ("J.W. Charles"), a brokerage firm located in Boca Raton, Florida. Both accounts were controlled by, and for the benefit of, Curtis, Mangan and Masley.

66.    At the direction of Curtis, Mangan and/or Masley, this stock was sold to United States investors at an average price of $1.423 per share, for proceeds of at least $711,500.

200,000 Share Issuance to Rang Tuck

67.    On September 15, 1994, Varsi, at Mangan's direction, caused Windswept to issue 200,000 shares of Windswept common stock to Rang Tuck.

68.    Rang Tuck, was a Venezuelan shell company. Although, Gomez was its president, Rang Tuck was actually controlled by, and for the benefit of, Curtis, Mangan and Masley.

69.    According to the board resolution authorizing the issuance, which Varsi and Mangan signed, this stock was issued in exchange for services to Windswept provided by Rang Tuck.

Rang Tuck never performed any services for Windswept and never paid any other consideration for the 200,000 shares of Windswept stock.

70.    Curtis, Mangan, Masley and/or Varsi, directly or indirectly, provided this corporate resolution to Windswept's independent auditors.

71.    Curtis, Mangan and Masley knew, or were at least reckless in not knowing, that Rang Tuck did not perform any services for Windswept and that they controlled Rang Tuck.

72.    Varsi knew, or was at least reckless in not knowing, that Rang Tuck did not perform any services for Windswept and that Rang Tuck was controlled by Curtis, Mangan, and Masley.

73.    On September 19, 1994, Windswept filed a Form S-8 registration statement, signed by Varsi and Mangan, which purported to register 1,153,000 shares of Windswept common stock, including the 200,000 shares issued to Rang Tuck on September 15, 1994.

74.    Gomez deposited the stock issued to Rang Tuck into an account held in the name of Abet at Canaccord. This account was controlled by Curtis, Mangan and Masley.

75.    At the direction of Curtis, Mangan and/or Masley, this stock was sold to United States investors, at an average price of $2.153 per share, for profits of approximately $430,600.

200,000 Share Issuance to Piedmont

76.    On March 2, 1995, Windswept issued 100,000 shares of common stock to Piedmont.

77.    Piedmont, an Irish shell company, was controlled by, and for the benefit of, Curtis, Mangan and Masley.

78.    On March 9, 1995, Windswept filed a Form S-8 registration statement, signed by Behanna and Mangan, which purported to register 500,000 shares of Windswept common stock, including the 100,000 shares issued to Piedmont on March 2, 1995.

16

GRAUBARD DECL. EX. 1

SEC016

79.   On March 20, 1995, Windswept issued an additional 100,000 shares of Windswept common stock to Piedmont, which were purportedly registered pursuant to the March 9, 1995 Form S-8 registration statement.

80.   Piedmont never performed any services for Windswept and never paid any other consideration for the 200,000 shares of Windswept stock.

81.   Behanna knew, or was at least reckless in not knowing, that Piedmont did not perform any services for Windswept and that Piedmont was controlled by Curtis, Mangan, and Masley.

82.   The Windswept stock issued to Piedmont was deposited into an account controlled by Curtis, Mangan and Masley at Canaccord.

83.   At the direction of Curtis, Mangan and/or Masley, this stock was sold to United States investors, at an average price of $1.653 per share, for proceeds of approximately $330,600.

Stock Issuances to Hersilia

84.   From May 1995 through May 1996, Curtis, Mangan and Masley obtained a total of 2.8 million shares of unregistered stock in three transactions purportedly falling within the Regulation S safe harbor.

85.   Windswept issued this stock to Hersilia Investments, Ltd. ("Hersilia Investments") and the Hersilia Trust (collectively "Hersilia"). Hersilia Investments is a British Virgin Islands corporation wholly owned by the Hersilia Trust, which is located in Guernsey, Channel Islands.

86.   Masley created the Hersilia Trust in 1995 as a vehicle for fraudulently issuing this stock while at the same time disguising his own involvement and that of Curtis and Mangan.

87.   Mangan personally received a twelve percent "commission" for all of the Windswept stock sold to Hersilia. This commission was based on the subscription price and was paid from

Windswept's proceeds. Of this, Mangan kept ten percent for himself and paid the remaining two

percent to Kessler, then a Windswept officer and director, as consideration for Kessler's

acquiescence in the scheme.

88.    Kessler and Behanna knew, or were at least reckless in not knowing, that Hersilia was

controlled by Curtis, Mangan, and Masley.

89.    On May 17, 1995, Windswept issued 500,000 shares of common stock to Hersilia at the

price of $.50 per share, in purported compliance with the Regulation S safe harbor. Kessler

signed the board resolution which authorized the issuance of this stock. Curtis, Mangan, Masley

and/or Varsi, directly or indirectly, provided this corporate resolution to Windswept's

independent auditors.

90.    On July 28, 1995, Windswept issued another 500,000 shares of common stock to

Hersilia, at the price of $.50 per share, in purported compliance with the Regulation S safe

harbor. Masley, on behalf of himself, Curtis and Mangan, paid Windswept $500,000 for the

shares issued on May 17 and July 28. Windswept paid Mangan a $60,000 commission and

Mangan, in turn, paid Kessler $10,000.

91.    At least 500,000 of the 1 million shares issued to Hersilia on May 17 and July 28, 1995,

were deposited into two accounts controlled by Curtis, Mangan and Masley at Canaccord.

Curtis, Mangan and/or Masley caused the stock to be sold to United States investors, at an

average price of $1.653 per share, for proceeds of at least $1.46 million.

92.    On October 13, 1995, Windswept issued 800,000 shares of common stock to Hersilia at

the price of $1.00 per share, in purported compliance with the Regulation S safe harbor. Kessler

signed the board resolution which authorized this issuance of stock, and which recited that it was being issued pursuant to Regulation S.

93.    Curtis, Mangan, Masley and/or Varsi, directly or indirectly, provided this corporate resolution to Windswept's independent auditors.

94.    Masley, on behalf of himself, Curtis and Mangan, paid $800,000 for these shares. Windswept paid a $96,000 commission to Mangan who, in turn, paid Kessler $16,000.

95.    Masley caused this stock to be deposited into an account controlled by Curtis, Mangan and Masley and held in the name of Hersilia at Wall Street Equities, a New York brokerage firm. Curtis, Mangan and Masley caused 700,000 of these shares to be sold to United States investors, at an average price of $1.303 per share, for proceeds of approximately $912,200.

96.    On May 1, 1996, Windswept issued 1 million shares of common stock to Hersilia at the price of $.50 per share, in purported compliance with the Regulation S safe harbor. Masley, on behalf of himself, Curtis and Mangan, paid $500,000 for these shares. Windswept paid Mangan a $60,000 commission and Mangan, in turn, paid Kessler $10,000.

97.    Masley caused this stock to be deposited into Hersilia's account at Wall Street Equities. Curtis, Mangan and/or Masley caused 580,000 of these shares to be sold to United States investors, at an average price of $.856 per share, for proceeds of approximately $497,000. The remaining 420,000 shares were transferred to another nominee account, also held at Wall Street Equities, also controlled by Masley, and sold to United States investors, at an average price of $.602 per share, for proceeds of approximately $256,300.

115,000 Share Issuance to Broadcast Communications

98.    On July 7, 1996, Mangan, Kessler and Behanna caused Windswept to issue 115,000

shares of common stock to Broadcast Communications, a Liberian corporation. This stock was

purportedly registered on a Form S-8 registration statement, filed on December 21, 1995, and

signed by Kessler, Mangan and Behanna.

99.    Broadcast Communications did not provide any services to Windswept.

100.    Broadcast Communications was Kessler's nominee.

101.    Behanna, Mangan and Kessler knew, or were at least reckless in not knowing, that

Broadcast Communications did not provide services to Windswept.

102.    On July 8, 1996, the stock issued to Broadcast Communications was deposited into

Broadcast Communications' account at Janney Montgomery Scott, Inc., a U.S. broker-dealer

registered with the Commission.

103.    Kessler caused this stock, which he obtained for no consideration, to be sold to United

States investors at an average price of $.624 per share, for approximately $71,790.

Windswept's Filings

104.    Windswept's Form 10-Q for the quarter ended July 1994, signed by Varsi, failed to

disclose (i) that Curtis and Masley were control persons of Windswept; (ii) that Curtis and

Mangan had each been convicted of a felony within the past five years; (iii) that the stock

issuance to Abet was a related party transaction; and (iv) that Abet had performed no services nor

paid any other consideration for the stock issued to it. All of this information was material and

required to be disclosed under Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20

and 13a-13 thereunder. Windswept did not subsequently file any corrective disclosure.

105.    Windswept's Form 10-Q for the quarter ended October 1994, signed by Varsi, failed to disclose (i) that Curtis and Masley were control persons of Windswept; (ii) that Curtis and Mangan had each been convicted of a felony within the past five years; (iii) that the stock issuances to Sampson Leasing and Rang Tuck were related party transactions; and (iv) that Sampson Leasing and Rang Tuck had performed no services nor paid or provided any other consideration for the stock issued to them. All of this information was material and required to be disclosed under Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder. Windswept has not filed any corrective disclosure.

106.    Windswept's Form 10-K for its fiscal year ended April 30, 1995, authored and signed by Behanna, failed to disclose (i) that Curtis and Masley were control persons of Windswept; (ii) that Curtis and Mangan had each been convicted of a felony within the past five years; (iii) that the stock issuances to Abet, Sampson Leasing, Rang Tuck and Piedmont were related party transactions; and (iv) that Abet, Sampson Leasing, Rang Tuck and Piedmont had performed no services nor paid or provided any other consideration for the stock issued to them. All of this information was material and required to be disclosed under Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder. Windswept did not subsequently file any corrective disclosure.

107.    Windswept's quarterly and annual filings for its fiscal year ended April 30, 1996, authored by Nearen, and its Form 10-Q for its quarter ended July, 1996, all signed by Behanna, Kessler and Mangan, failed to disclose (i) that Curtis and Masley were control persons of Windswept; (ii) that Curtis had been convicted of a felony within the past five years; (iii) that the stock issuances to Hersilia and Broadcast Communications were related party transactions;

and (iv) that Broadcast Communications had performed no services nor paid any other

consideration for the stock issued to it.  All of this information was material and required to be

disclosed under Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20 and 13a-13

thereunder.   Windswept has not filed any corrective disclosure.

The Defendants Acted With Scienter

108.    Curtis, Mangan and Masley knew, or were reckless in not knowing,  that they controlled

Windswept; that they controlled Abet, Sampson Leasing, Rang Tuck, Piedmont and Hersilia; that

Kessler controlled Broadcast Communications; that Windswept received no consideration for the

stock it issued to Abet, Sampson Leasing, Rang Tuck, Piedmont and Broadcast

Communications; that Mangan and Kessler received kickbacks on Windswept's Regulation S

placements; and, that Curtis and Mangan were convicted felons.

109.    Varsi, as CEO and through his involvement in Windswept's day-to-day operations, knew,

or was reckless in not knowing, that Windswept was controlled by Curtis, Mangan and Masley;

that Curtis, Mangan and Masley controlled Abet, Sampson Leasing and Rang Tuck;  and that

Windswept received no consideration for the stock it issued to Abet, Sampson Leasing and Rang

Tuck.

110.    Behanna, as CFO and through his involvement in Windswept's day-to-day operations,

knew, or was reckless in not knowing, that Windswept was controlled by Curtis, Mangan and

Masley; that Curtis, Mangan and Masley controlled Piedmont and Hersilia; that Kessler

controlled Broadcast Communications; and that Windswept received no consideration for the

stock it issued to Piedmont and Broadcast Communications and less than full consideration for

the stock it issued to Hersilia.

111. Kessler, through his involvement in Windswept's day-to-day operations, knew, or was reckless in not knowing, that Windswept was controlled by Curtis, Mangan and Masley; that Curtis, Mangan and Masley controlled Hersilia; that he received kickbacks on Windswept's stock issuances to Hersilia; that he controlled Broadcast Communications; and that Windswept received no consideration for the stock it issued to Broadcast Communications.

**ICIS**

Background

112. Curtis, Mangan and Masley obtained control of ICIS in late 1994. Curtis, Mangan and Masley controlled all aspects of the business affairs of ICIS, including the ability to cause ICIS to issue stock and the ability to appoint ICIS' officers and directors.

113. In approximately April 1995, Nearen was engaged by Curtis, Mangan and Masley as "special securities counsel" to ICIS. In September 1995, Nearen became ICIS' president and a member of ICIS' board. Around the same time, Kessler joined ICIS as a director. Although not formally titled as officers or directors of ICIS, Curtis, Mangan and Masley in fact acted in those capacities, controlling ICIS' day-to-day operations in all material respects. In or about mid-1995, Mangan took primary responsibility, on behalf of himself, Curtis and Masley, for ICIS' day-to-day operations. Notwithstanding their nominal positions with ICIS, Nearen and Kessler operated ICIS at Mangan's direction.

114. As set forth in more detail below, from at least 1995 through 1996, ICIS issued at least 2.38 million shares of common stock to nominees of Curtis, Mangan and Masley.

115. At least 1.69 million shares of this stock were sold to public investors, generating profits to Curtis, Mangan and Masley of over $2.4 million.

116. In order to retail the ICIS stock, Irni and Gomez, on behalf of Curtis, Mangan and Masley, paid kickbacks to brokers who retailed the fraudulently issued stock to their customers.

ICIS' Form S-8 Registration

117. Between March 23 and March 31, 1995, ICIS issued a total of 250,000 shares of ICIS stock to Irni, Gomez, Rang Tuck, Piedmont and Habib Capital, a New York shell corporation owned by Irni. On May 8, 1995, ICIS issued an additional 230,000 shares of common stock to Irni.

118. Piedmont, Habib Capital and Rang Tuck were controlled by, and for the benefit of, Curtis, Mangan and Masley.

119. On March 23, 1995, ICIS filed a Form S-8 registration statement which purported to register the issuance of 500,000 shares of ICIS common stock, including the 480,000 shares described in Paragraph 117, above.

120. In order to issue this stock, Nearen, drafted, and directed ICIS' president to sign, sham agreements between the purported recipients of the stock and ICIS, which indicated that the stock was issued in exchange for consulting services. Nearen also drafted corporate resolutions indicating that the stock was to be issued to Irni, Gomez, Piedmont, Habib Capital and Rang Tuck in exchange for the value of services performed for ICIS plus $.25 per share. Nearen directed ICIS' president and vice-president to sign these resolutions and submit them to ICIS' transfer agent.

121. Curtis, Mangan, Masley and/or Nearen, directly or indirectly, provided the corporate resolutions to ICIS' auditor. They knew, or were reckless in not knowing, that these documents were false and misleading.

24

122.   Imi, Piedmont, Rang Tuck, Gomez and Habib Capital were not employees of ICIS and did not perform services for the benefit of ICIS in exchange for this stock.  Masley paid ICIS $.25 per share for this stock.  Between March 23, 1995 and May 8, 1995, ICIS stock traded at a low of $5 per share and a high of $7 3/4 per share.

123.   As described in Paragraphs 124 through 130, below, at the direction of Curtis, Mangan and Masley, at least 280,000 shares of this stock were sold to United States investors, at an average price of $5.071 per share, for proceeds of at least $1.42 million.

Sales of the S-8 Stock - Kickback Scheme

124.   Curtis, Mangan, Masley, Imi and Gomez directed the sale of 80,000 shares of the ICIS stock described in Paragraph 117, above, to customers of Securities Planners.  On May 17, 1995, Gomez received this stock in an account in Gomez' name at M. Rimson & Co., Inc. ("Rimson"), a now defunct New York brokerage firm.  This stock was part of the 230,000 Form S-8 shares originally issued to Imi on May 8, 1995, as described in Paragraph 117, above.

125.   While employed by Securities Planners, Lipkin and Shainberg agreed with Imi to retail this ICIS stock to Securities Planners' customers in return for a 50 percent undisclosed kickback.

126.   From May 22, 1995 through June 15, 1995, Lipkin and Shainberg sold and/or directed the sale of 80,000 shares of ICIS stock to Securities Planners' customers pursuant to the kickback agreement.  Through the use of directed trades, Lipkin and Shainberg obtained the stock from Gomez's account at Rimson.

127.   Sale of this ICIS stock from Gomez's account at Rimson generated $320,514 in proceeds, of which Gomez retained $161,290 for the ultimate benefit of Curtis, Mangan and Masley.

GRAUBARD DECL. EX. 1                                          SEC025

128.   Gomez wired the remaining $159,224 to a Nassau, Bahamas bank account held for the benefit of Lipkin and Shainberg.

129.   Lipkin and Shainberg did not disclose to their customers that they were to be paid a 50 percent kickback for selling ICIS stock.

130.   Of the remaining 400,000 shares of ICIS stock described in Paragraph 117, above, Curtis, Mangan and Masley deposited at least 200,000 shares in accounts they held at various Canadian broker-dealers and sold this stock to United States investors for profits in excess of $1.1 million.

"Acquisition" of Millenium Environmental Group, Inc.

131.   On March 30, 1995, Curtis, Mangan and Masley obtained 1 million shares of ICIS stock through a fraudulent transaction by causing ICIS to acquire Millenium Environmental Group, Inc. ("Millenium"), a Delaware corporation controlled by Curtis, Mangan and Masley.

132.   In or about February 1995, Curtis, Mangan and Masley caused Millenium to purchase the building in which ICIS' offices were located by making a $250,000 down payment and obtaining a $700,000 mortgage.  Within a few weeks, Curtis, Mangan and Masley then caused ICIS to acquire Millenium (and assume the $700,000 mortgage) in exchange for one million shares of ICIS.

133.   The ICIS stock was issued in the names of twenty purported shareholders of Millenium. In fact, these were fictitious names and such shareholders never existed.

134.   Curtis, Mangan and Masley, as the true owners of Millenium, received 1 million shares of ICIS stock in exchange for the $250,000 downpayment on the building, a price of $.25 per share. On March 30, 1995, the day the stock was issued, ICIS was trading at $7 per share.

135.    Nearen, on behalf of Curtis, Mangan and Masley, drafted a corporate resolution authorizing the issuance of the stock to Millenium "shareholders." Nearen had ICIS' president and vice-president sign the resolution and submit it to ICIS' transfer agent.

136.    Curtis, Mangan, Masley and/or Nearen, directly or indirectly, provided the corporate resolution to ICIS' auditor. They knew, or were reckless in not knowing, that this document was false and misleading.

137.    Almost two months after the Millenium "acquisition," Nearen prepared a conformed copy of the Millenium purchase agreement, which falsely represented the circumstances and facts surrounding this transaction. Nearen attached this contract as an exhibit to ICIS' Form 10-Q for the quarter ended March 31, 1995, portions of which Nearen prepared.

138.    Nearen knew, or was at least reckless in not knowing, that the purchase of Millenium was a sham, that Millenium was controlled by Curtis, Mangan and Masley and that the "shareholders" listed in the agreement were fictitious.

139.    As alleged further in Paragraphs 140 through 145, below, Irni, at the direction of Curtis, Mangan, Masley, caused approximately 250,000 shares of the ICIS stock, purportedly issued to Millenium, to be sold to the public for the benefit of Curtis, Mangan and Masley, by paying kickbacks to Lipkin, Shainberg and Shatles.

Lipkin and Shainberg

140.    Irni, at the direction of Curtis, Mangan, Masley, directed the sale of 100,000 shares of the ICIS stock issued in connection with the Millenium transaction to customers of Securities Planners. While employed by Securities Planners, Lipkin and Shainberg agreed with Irni to sell this stock in return for kickbacks of 50 percent.

**GRAUBARD DECL. EX. 1**                              27                              **SEC027**

141.    In June 1995, Irni deposited 50,000 shares of this stock in an account that he controlled at Securities Planners. Irni gave the remaining 50,000 shares to Lipkin and Shainberg as a kickback.

142.    From June 13, 1995 through October 6, 1995, Lipkin and Shainberg sold and/or directed the sale of 100,000 shares of ICIS stock issued in connection with the Millenium transaction to Securities Planners' customers.

143.    Securities Planners' customers were not told that Lipkin and Shainberg would receive a 50 percent kickback for selling ICIS stock.

144.    The sale of the 50,000 ICIS shares given to Lipkin and Shainberg generated proceeds to Lipkin and Shainberg of at least $112,500.

145.    The sale of the 50,000 ICIS shares deposited into Irni's account at Securities Planners generated proceeds of at least $81,307.

Shatles

146.    In or about June 1995, Irni agreed to give Shatles 50,000 shares of ICIS stock that was issued in connection with the Millenium transaction, in exchange for Shatles causing 100,000 shares of ICIS stock to be sold to customers of S.D. Cohn, a broker-dealer controlled by Shatles.

147.    On June 5, 1995, Irni deposited 100,000 shares of ICIS into a brokerage account he had opened in his name at S.D. Cohn. From June 12, 1995 through July 12, 1995, Shatles sold and/or directed the sale of this stock to the public, generating proceeds of at least $220,637.

148.    Irni paid the 50,000 share kickback to Shatles, which Shatles retailed to S.D. Cohn's customers for proceeds of approximately $210,645.

149.    S.D. Cohn's customers were not told that Shatles would receive a 50 percent kickback for selling ICIS stock.

Canadian Accounts

150.    Curtis, Mangan and Masley deposited 400,000 of the ICIS shares that were issued in the Millenium transaction, into nominee accounts which they controlled at Canaccord and Levesque Beaubien Geoffrion, Inc. ("Levesque"), a brokerage firm located in Quebec.

151.    Curtis, Mangan and Masley caused this stock to be sold to United States investors for approximately $317,500.

"Acquisition" of ADTV, Inc.

152.    In April 1995, Curtis, Mangan and Masley obtained 900,000 shares of ICIS stock through a fraudulent transaction in which ICIS acquired ADTV, Inc. ("ADTV"). The stock was to be issued to ADTV's six "shareholders," pursuant to Rule 144 under the Securities Act, 17 C.F.R. §230.144.

153.    ADTV was a shell corporation controlled by Curtis, Mangan and Masley.

154.    On May 3, 1995, in order to effect this transaction, ICIS issued 150,000 shares of common stock to each of ADTV's six purported "shareholders." In fact, these were fictitious names and such shareholders never existed.

155.    Nearen drafted a corporate resolution authorizing this issuance of the stock to ADTV "shareholders." Nearen had ICIS' president sign the resolution and submit it to ICIS' transfer agent.

156.   Curtis, Mangan, Masley and/or Nearen, directly or indirectly, provided the corporate resolution to ICIS' auditor. They knew, or were reckless in not knowing, that this document was false and misleading.

157.   Approximately one month after the stock had been issued, Nearen created a fraudulent "conformed copy" of the ADTV purchase agreement. Nearen caused this document to be attached as an exhibit to ICIS' Form 10-Q for the quarter ended March 31, 1995.

158.   Nearen knew, or was at least reckless in not knowing, that the purchase of ADTV was a sham, that ADTV was controlled by Curtis, Mangan and Masley and that the "shareholders" listed in the agreement were fictitious.

159.   On June 27, 1995, Curtis, Mangan and Masley caused this stock to be canceled and reissued in purported compliance with Regulation S.

160.   In April 1996, according to a document which Nearen prepared and supplied to ICIS' transfer agent, 750,000 of these ICIS shares were canceled because "the sellers failed to execute and/or comply with the terms set forth in the purchase agreement."

161.   Of the 150,000 shares of ICIS stock that were not canceled, Masley deposited 60,000 shares into an account they controlled at Canaccord and sold this stock to United States investors for profits of approximately $40,539.

750,000 Share Regulation S Issuance to Melos Investments, Ltd.

162.   On April 2, 1996, Curtis, Mangan and Masley caused ICIS to issue 750,000 shares of ICIS common stock to Melos Investments, Ltd. ("Melos"), a non-operational Irish shell corporation, at $.25 per share. This stock was issued in purported compliance with Regulation S.

163.   Melos was controlled by, and a nominee of, Curtis, Mangan and Masley.

164.   This stock was deposited into Melos' account at Canaccord, which was controlled by Curtis, Mangan and Masley.

165.   This stock was sold to United States investors for proceeds of at least $478,434.

Lyons, Orr, Vinci and Noel

166.   While employed by First Cambridge, Lyons, Orr, Vinci, and Noel agreed with Irni to sell ICIS stock to First Cambridge customers in return for cash kickbacks.

167.   From March 29, 1995 through April 17, 1995, Lyons, Orr, Vinci and Noel sold or directed the sale of 69,300 shares of ICIS stock, which originated from Curtis, Mangan and Masley, to nine First Cambridge customers, at a total cost to the customers of at least $517,775.

168.   First Cambridge's customers were not told that Lyons, Orr, Vinci and Noel would receive a kickback for selling ICIS stock.

169.   As a result of this kickback agreement, Irni paid kickbacks to Lyons, Orr, Vinci and Noel totaling approximately $110,000.

ICIS Filings

170.   ICIS' public filings with the Commission, including its quarterly reports for the fiscal quarters ended March 31, 1995 ("March 1995 10-Q") and June 30, 1995 ("June 1995 10-Q"), and its Form 10-KSB for the fiscal year ended December 31, 1995 ("1995 Form 10-KSB"), each of which Nearen drafted, failed to disclose (i) that Curtis, Mangan and Masley were control persons of ICIS; (ii) that Curtis and Mangan had each been convicted of a felony within the past five years; (iii) that the stock issuances to Irni, Gomez, Rang Tuck, Piedmont, Habib Capital, Millenium and ADTV were related party transactions; and (iv) that Irni, Gomez, Rang Tuck, Piedmont, and Habib Capital had performed no services nor paid any other consideration for the

ICIS stock issued to them. Kessler, as director, and Nearen, as president and director, signed

ICIS' 1995 Form 10-KSB. All of this information was material and required to be disclosed

under under Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

thereunder. ICIS did not subsequently file any corrective disclosure.

171.    ICIS' March 1995 Form 10-Q falsely stated that Millenium had twenty "shareholders"

and that its president was "David Steele," when in fact the shareholders referred to in the

documents attached to these filings were fictitious, as was David Steele. These misstatements

were material and ICIS did not subsequently file any corrective disclosure.

172.    ICIS' March 1995 Form 10-Q, June 1995 Form 10-Q, and 1995 Form 10-KSB falsely

stated that ADTV had six shareholders and falsely indicated that ICIS received value for this

issuance of stock. These misstatements were material and ICIS did not subsequently file any

corrective disclosure.

173.    Nearen drafted and signed ICIS' 1995 Form 10-KSB, and its quarterly reports for the

quarters ended March 31, 1996 and June 30, 1996. Each of these periodic reports failed to

disclose that (i) Curtis, Mangan and Masley were control persons of ICIS; (ii) that Melos was a

nominee of Curtis, Mangan and Masley; and (iii) that the stock issuance to Melos was a related

party transaction. All of this information was material and required to be disclosed under under

Sections 13(a) and 13(b) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

The Defendants Acted With Scienter

174.    Curtis, Mangan and Masley knew, or were reckless in not knowing, that they controlled

ICIS; that they controlled Rang Tuck, Piedmont, Habib Capital, Millenium, ADTV and Melos;

that ICIS received no consideration for the stock it issued to ADTV and only nominal

consideration for the stock ICIS issued to Rang Tuck, Piedmont, Habib Capital, Millenium and Melos; and that Curtis and Mangan were convicted felons.

175.    Nearen, as a director and president of ICIS and through his involvement in ICIS' day-to-day operations, knew, or was reckless in not knowing, that ICIS was controlled by Curtis, Mangan and Masley; that Curtis, Mangan and Masley controlled Rang Tuck, Piedmont, Habib Capital, Millenium, ADTV and Melos; and that ICIS received no consideration for the stock it issued to ADTV and only nominal consideration for the stock ICIS issued to Rang Tuck, Piedmont, Habib Capital, Millenium and Melos.

176.    Kessler, as a director of ICIS and through his involvement in ICIS' day-to-day operations, knew, or was reckless in not knowing, that ICIS was controlled by Curtis, Mangan and Masley; that Curtis, Mangan and Masley controlled Rang Tuck, Piedmont, Habib Capital, Millenium, ADTV and Melos; and that ICIS received no consideration for the stock it issued to ADTV and only nominal consideration for the stock ICIS issued to Rang Tuck, Piedmont, Habib Capital, Millenium and Melos.

**PILOT**

Background

177.    Curtis, Mangan and Masley obtained management control of Pilot, a publicly traded shell company, in or about early 1994. Curtis, Mangan and Masley controlled all aspects of the business affairs of Pilot, including the ability to cause Pilot to issue stock and the ability to appoint Pilot's officers and directors.

178.    In May 1994, Curtis, Mangan and Masley appointed Gomez president of Pilot. In or about mid-1995, Curtis, Mangan and Masley appointed Nearen president and a member of the

33

board of directors of Pilot. Although not formally titled as officers or directors of Pilot, Curtis, Mangan and Masley in fact acted in that capacity, controlling Pilot's day-to-day operations in all material respects. Until in or about mid-1995, Masley had primary responsibility, on behalf of himself, Curtis and Mangan, for Pilot's day-to-day operations. After mid-1995, Mangan, on behalf of himself, Curtis and Masley, took over this responsibility.

179. Notwithstanding their nominal positions as president of Pilot, Gomez and Nearen operated Pilot at the direction of Curtis, Mangan and Masley.

180. From at least 1994 through 1996, Pilot issued at least 2.26 million shares of common stock to nominees of Curtis, Mangan and Masley for no consideration, as discussed more specifically below in Paragraphs 181 through 192.

181. At least 279,700 shares of this stock were sold to United States investors, generating proceeds to Curtis, Mangan and Masley of $2 million.

Pilot's 10,000 Share Regulation D Issuance

182. Regulation D provides a safe harbor exception to the registration requirements of the Securities Act for certain limited offers and sales of securities to accredited investors. 17 C.F.R. § 230.501 *et. seq.*

183. On May 25, 1994, Gomez, acting at the direction of Masley, caused Pilot to issue a total of 10,000 shares of common stock to three fictitious investors.

184. Pilot received no consideration for this stock.

185. On June 13, 1994, Gomez, acting at the direction of Masley, caused Pilot to file with the Commission a Notice of Sales of Securities Under Regulation D and Section 4(6) of the Securities Act, which Gomez signed. This Form D stated that the 10,000 shares of Pilot stock

described in Paragraph 183, above, were being sold to three accredited investors for an aggregate offering price of $10,000.

186.    This stock was deposited into an account Curtis, Mangan and Masley controlled at Levesque (See Paragraph 150, above).

187.    At the direction of Curtis, Mangan and/or Masley, this stock was sold to United States investors, at an average price of $7.58 per share, for proceeds of at least $75,800.

Pilot's 2,225,000 Share Regulation D Issuance

188.    On June 6, 1994, Gomez, acting at the direction of Masley, caused Pilot to issue 2.25 million shares of common stock to twenty fictitious investors, with each purportedly purchasing 112,500 shares for an aggregate offering price of $225,000.

189.    On June 21, 1994, Gomez, acting at the direction of Masley, caused Pilot to file a Notice of Sales of Securities Under Regulation D and Section 4(6) of the Securities Act, which he signed, with the Commission. This Form D stated that the 2.25 million shares of Pilot stock described in Paragraph 188, above, were being sold to 20 accredited investors for an aggregate offering price of $225,000.

190.    Pilot received no consideration for this stock.

191.    Overall, at the direction of Curtis, Mangan and/or Masley, at least 199,700 shares of this stock was sold, through various broker-dealers, to United States investors, at an average price of $9.89 per share, for proceeds of at least $1,975,567.

192.    As set forth in Paragraphs 193 through 202, below, Curtis, Mangan and Masley paid kickbacks of over $353,000 to Milligan, Lyons, Orr, Vinci and Noel in exchange for their retailing approximately 70,000 shares of this stock to their customers.

J.P. Milligan & Co., Inc.

193.    Masley, on behalf of himself, Curtis and Mangan, caused at least 19,100 shares of the Pilot stock described above to be sold to customers of J.P. Milligan. While employed by J.P. Milligan, Milligan agreed with Masley to sell this stock in return for kickbacks of 50 percent.

194.    From November 17, 1995 through February 2, 1996, Milligan caused 19,100 shares of Pilot stock to be sold to J.P. Milligan's customers.

195.    J.P. Milligan's customers were not told that Milligan would receive a 50 percent kickback for selling Pilot stock.

196.    The sale of this stock, at $12 per share, generated proceeds of $229,200. Milligan wired the proceeds to Irni's brokerage account in the name of Habib Capital at Union Securities, a brokerage firm in Vancouver, British Columbia.

197.    Irni then wired $93,600 of these funds to a bank account in the name of Stone International Trading Corporation, which Milligan controlled.

198.    Irni retained proceeds of $135,600 for Curtis, Mangan and Masley.

Lyons, Orr, Vinci and Noel

199.    While employed by First Cambridge, Lyons, Orr, Vinci and Noel agreed with Irni to sell Pilot stock to First Cambridge customers in return for cash kickbacks.

200.    From March 16 through April 6, 1995, Lyons, Orr, Vinci and Noel sold or directed the sale of 51,000 shares of Pilot stock, which originated from Curtis, Mangan and Masley, to First Cambridge customers, at a total cost to customers of at least $765,000.

201.    First Cambridge's customers were not told that Lyons, Orr, Vinci and Noel would receive a kickback for selling Pilot stock.

202.    As a result of this kickback agreement, Irni paid kickbacks to Lyons, Orr, Vinci and Noel totaling approximately $260,000.

Pilot's Filings

203.    Pilot's public filings with the Commission, specifically its June 13, 1994 and June 21, 1994 Form D filings, both signed by Gomez, falsely stated (i) that Pilot stock was being issued to accredited investors; (ii) that Pilot did not, and never intended to, sell to non-accredited investors in these offerings; (iii) that Pilot was to receive remuneration for the stock; and (iv) that no persons would be paid for soliciting purchases of the securities that were subject of the offering. These misstatements were material.

204.    Pilot's Form D filings failed to disclose that Curtis, Mangan and Masley beneficially owned in excess of 10 percent of Pilot's common stock.  This information was material and was required to be disclosed pursuant to Regulation D, 17 C.F.R. § 230.503.

The Defendants Acted With Scienter

205.    Curtis, Mangan and Masley knew, or were reckless in not knowing, that they controlled Pilot; that Pilot received no consideration for the stock it issued to the fictitious investors; and, that the stock issued by Pilot was for the benefit of Curtis, Mangan and Masley.

206.    Gomez, as president of Pilot, knew, or was reckless in not knowing, that Pilot was controlled by Curtis, Mangan and Masley; that Pilot received no consideration for the stock it issued to the fictitious investors; and, that the stock issued by Pilot was for the benefit of Curtis, Mangan and Masley.

37

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5**

207.    The Commission realleges and incorporates by reference the allegations contained in
Paragraphs 1 through 206 above.

208.    Defendants Curtis, Mangan, Masley, Nearen, Irni, Gomez, Kessler, Behanna, Varsi,
Milligan, Lipkin, Shainberg, Lyons, Orr, Vinci, Noel and Shatles, directly or indirectly, singly or
in concert, by use of the means or instruments of transportation or communication in, or the
means or instrumentalities of, interstate commerce, or of the mails, in the offer or sale and in
connection with the purchase or sale of securities, knowingly or recklessly, have:  (a) employed
devices, schemes and artifices to defraud; (b) obtained money or property by means of, and
otherwise made untrue statements of material fact, and omitted to state material facts necessary
in order to make the statements made, in light of the circumstances under which they were made,
not misleading; and (c) engaged in acts, transactions, practices and courses of business which
operated or would operate as a fraud or deceit upon the purchasers of securities and upon other
persons.

209.    As is more fully set forth above, defendants Curtis, Mangan and Masley knowingly
participated in a fraudulent scheme whereby they unjustly enriched themselves through their
undisclosed control over three public companies. They used this control to: (a) direct the
issuance of over eight million shares of unregistered stock, for nominal or no consideration, to
their nominees, which are primarily non-operational foreign shell corporations; (b) disguise their

activities by causing Windswept, ICIS and Pilot to file materially false and misleading

documents with the Commission; and, (c) direct the sale of over five million shares of this

unregistered stock to be sold to United States investors, frequently through the payment of bribes

to brokers, generating illicit proceeds to Curtis, Mangan and Masley of more than $8 million.

210.    As is more fully set forth above, Irni knowingly and/or recklessly participated in this

scheme to defraud. At the direction of Curtis, Mangan and Masley, Irni received and disposed of

the fraudulently issued stock by using phony foreign corporations, paying undisclosed kickbacks

to brokers and buying and selling these securities in foreign and domestic brokerage accounts,

usually through the use of nominee sham corporations that Irni purported to operate.

211.    As is more fully set forth above, Gomez knowingly and/or recklessly participated in this

scheme to defraud. At the direction of Curtis, Mangan and Masley, Gomez served as the

president of Pilot and caused Pilot to issue unregistered stock to nominees of Curtis, Mangan and

Masley. Gomez also furthered the scheme by receiving and disposing of fraudulently issued

stock by using phony foreign corporations, paying undisclosed kickbacks to brokers and buying

and selling these securities in foreign and domestic brokerage accounts, usually through the use

of nominee sham corporations that Gomez purported to operate.

212.    As is more fully set forth above, Nearen knowingly and/or recklessly acted as counsel to

Curtis, Mangan and Masley in furtherance of this scheme to defraud. At the direction of Curtis,

Mangan and Masley, Nearen served as the president of ICIS and Pilot, engineered fraudulent

stock issuances, and drafted, and caused Windswept and ICIS to file, materially false and

misleading documents with the Commission.

213.   As is more fully set forth above, Varsi, Behanna, and Kessler, who were officers and/or

directors of Windswept, knowingly and/or recklessly furthered this scheme to defraud by causing

Windswept to issue unregistered stock in return for little or no consideration and to file

materially false and misleading documents with the Commission.

214.   As part of and in furtherance of the violative conduct, and as more fully set forth above,

Curtis, Mangan, Masley, Irni, Gomez, Lipkin, Shainberg, Lyons, Orr, Vinci, Noel and Shatles

each knowingly or recklessly engaged in a scheme to defraud in which Gomez and Irni, at the

direction of Curtis, Mangan and Masley, bribed Lipkin, Shainberg, Lyons, Orr, Vinci, Noel and

Shatles, and Masley, on behalf of himself, Curtis and Mangan, bribed Milligan, to induce them to

sell ICIS stock to retail customers throughout the United States without disclosing the bribes, or

the arrangement to pay the bribes, to customers.  In addition, as part of and in furtherance of the

violative conduct, and as more fully set forth above, Irni and Gomez negotiated the bribe

agreements with Lipkin, Shainberg, Lyons, Orr, Vinci, Noel and Shatles and Masley negotiated a

bribe agreement with Milligan, in which the scheme was described, bribes were offered or

arrangements were made for bribes to be paid.

215.   Defendants Curtis, Mangan, Masley, Irni and Gomez knew or recklessly disregarded that

neither the payment of the bribes to the brokers, nor the arrangement to pay them, was disclosed

to the brokers' retail customers in connection with the purchase of ICIS stock.

216.   Defendants Milligan, Lipkin, Shainberg, Lyons, Orr, Vinci, Noel and Shatles knowingly

or recklessly failed to disclose to their retail customers the bribes they received in connection

with the purchase and sale of securities.

**GRAUBARD DECL. EX. 1**

40

217.   The information omitted from disclosure to the customers in connection with the purchase and sale of such securities was material.

218.   By reason of the foregoing, Curtis, Mangan, Masley, Nearen, Irni, Gomez, Kessler, Behanna, Varsi, Milligan, Lipkin, Shainberg, Lyons, Orr, Vinci, Noel and Shatles have, directly or indirectly, singly or in concert, violated and, unless permanently enjoined, are reasonably likely in the future to violate Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### SECOND CLAIM FOR RELIEF

#### Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13

219.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 218 above.

220.   As is more fully set forth above, Windswept and ICIS failed to file with the Commission, in accordance with such rules and regulations as the Commission has prescribed:  (a) such information and documents (and such copies thereof) as the Commission required to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l; (b) such annual reports (and copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission has prescribed; and (c) in addition to the information expressly required to be included in such reports, such further material information as was necessary to make the statements made, in light of the circumstances in which they were

made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

221.    Curtis, Mangan, Masley, Behanna and Kessler were controlling persons of Windswept, pursuant to Section 20(a), of the Exchange Act and are liable as controlling persons for Windswept's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, as specified in Paragraph 220, above.

222.    Varsi was a controlling persons of Windswept, pursuant to Section 20(a) of the Exchange Act, and is liable as a controlling person for Windswept's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder, as specified in Paragraph 220, above.

223.    Curtis, Mangan, Masley and Nearen were controlling persons of ICIS, pursuant to Section 20(a) of the Exchange Act, and are liable as controlling persons for ICIS' violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, as specified in Paragraph 220, above.

224.    By reason of the foregoing, Varsi has violated, and unless enjoined, is reasonably likely in the future to violate, Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13.

225.    By reason of the foregoing, Curtis, Mangan, Masley, Kessler and Nearen have violated, and unless enjoined, are reasonably likely in the future to violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.

## THIRD CLAIM FOR RELIEF

### Violations of Section 13(b) of the
### Exchange Act and Rules 13b2-1 and 13b2-2

226.    The Commission realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 225 above.

227.    As is more fully set forth above, Windswept and ICIS, directly or indirectly, failed to

make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly

reflected the transactions and dispositions of its assets, in violation of Section 13(b)(2) of the

Exchange Act.

228.    Among other things, Curtis, Mangan, Masley, Kessler, Behanna and Varsi, directly or

indirectly, falsified or caused to be falsified certain of the books, records and accounts of

Windswept, in violation of Rule 13b2-1 of the Exchange Act.

229.    Among other things, Curtis, Mangan, Masley and Nearen, directly or indirectly, falsified

or caused to be falsified certain of the books, records and accounts of ICIS, in violation of Rule

13b2-1 of the Exchange Act.

230.    As described more fully above, Curtis, Mangan, Masley, Nearen, Kessler, Behanna and

Varsi, directly or indirectly, made or caused to be made materially false or misleading

statements, or omitted to state or caused another person to omit to state, material facts necessary

in order to make statements made, in the light of the circumstances under which such statements

were made, not misleading to an accountant in connection with (1) an audit or examination of the

financial statements of an issuer, or (2) the preparation or filing of a document or report required

to be filed with the Commission, in violation of Exchange Act Rule 13b2-2.

GRAUBARD DECL. EX. 1

SEC043

231.    At all times relevant hereto, Curtis, Mangan, Masley, Kessler, Behanna and Varsi were controlling persons of Windswept, pursuant to Section 20(a) of the Exchange Act, and are liable as controlling persons for Windswept's violation of Section 13(b)(2) of the Exchange Act.

232.    At all times relevant hereto, Curtis, Mangan, Masley and Nearen were controlling persons of ICIS, pursuant to Section 20(a) of the Exchange Act, and are liable as controlling persons for ICIS' violation of Section 13(b)(2) of the Exchange Act.

233.    By reason of the foregoing, Curtis, Mangan, Masley, Nearen, Kessler, Behanna and Varsi have violated and, unless enjoined, are reasonably likely in the future to violate, Section 13(b)(2) of the Exchange Act and Rules 13b2-1 and 13b2-2.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 13(d) of the Exchange Act and Rule 13d-1

234.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 233 above.

235.    Section 13(d) of the Exchange Act and Rule 13d-1 thereunder require that a person who acquires beneficial ownership of more than five percent of a class of equity securities which is registered with the Commission pursuant to Section 12 of the Exchange Act file a Statement on Schedule 13D disclosing such ownership and certain other information, within 10 days of the acquisition. Curtis, Mangan and Masley acted as a partnership and are therefore deemed a "person" for the purposes of Section 13(d).

236.    Prior to ICIS' issuance of 1 million shares of common stock in connection with the Millenium transaction in March 1995, ICIS had approximately 750,000 shares of common stock outstanding. Following the issuance of the 1 million shares of ICIS stock, Curtis, Mangan, and

Masley beneficially owned and controlled at least 55 percent of ICIS' outstanding common stock. Curtis, Mangan and Masley did not file a Statement on Schedule 13D disclosing this ownership interest.

237.    Prior to Windswept's issuance of 500,000 shares of common stock to Hersilia on May 17, 1995, Windswept had approximately 2.1 million shares of common stock outstanding. After the issuance, Curtis, Mangan, and Masley beneficially owned and controlled at least 19 percent of Windswept's outstanding common stock. Curtis, Mangan and Masley did not file a Statement on Schedule 13D disclosing this ownership interest.

238.    Curtis, Mangan and Masley, have violated and, unless enjoined, are reasonably likely in the future to violate, Section 13(d) of the Exchange Act thereunder by failing to file Schedule 13D with the Commission disclosing that they had, at various times, acquired more than five percent of both Windswept and ICIS.

## FIFTH CLAIM FOR RELIEF

### Violations of Section 5(a) and 5(c) of the Securities Act

239.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 238 above.

240.    The shares of Windswept, ICIS and Pilot are securities, within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. §§77b(1).

241.    Sections 5(a) and 5(c) of the Securities Act prohibit the sale of any security unless a registration statement is in effect with regard to that security, absent an applicable exemption from that requirement.

242. A Form S-8 registration statement permits an issuer to issue stock to "employees," which is defined to include consultants and advisors, for compensatory purposes, *"provided that bona fide* services shall be rendered by consultants or advisors and such services must not be in connection with the offer or sale of securities in a capital-raising transaction."

243. None of the stock Curtis, Mangan or Masley caused the Issuers to issue to nominees of Curtis, Mangan and Masley was properly registered using Form S-8, because in no instance were any bona fide services rendered to the Issuers.

244. To fall within the Regulation S safe harbor, the offer or sale of securities must be made in an "offshore transaction," meaning that the offers or sales may not be made to persons in the United States. Regulation S does not provide an exemption or safe harbor for the distribution or resale of securities in the United States and expressly states that the safe harbors are not available for any transaction or chain of transactions that may appear to be in technical compliance with all of the conditions and requirements of the regulation, but is actually part of a plan or scheme to evade the registration requirements of the Securities Act.

245. None of the issuances to nominees of Curtis, Mangan and Masley fell within the Regulation S safe harbor, because Curtis, Mangan and Masley were each U.S. persons.

246. As is more fully set forth above, no valid registration statement was in effect with regard to any sale of the Windswept, ICIS and Pilot securities at issue. Windswept, Curtis, Mangan, Masley, Nearen, Irni and Gomez offered to buy, offered to sell, and sold shares of Windswept and ICIS, as described above, using the means or instruments of transportation or communication in interstate commerce, or of the mails, when no exemption from registration was available. The stock Curtis, Mangan and Masley caused the Issuers to issue as part of the scheme was

purportedly registered using a Form S-8 registration statement or purportedly issued in compliance with the Regulation S safe harbor.

247.    By reason of the foregoing, Curtis, Mangan, Masley, Nearen, Irni and Gomez have violated and, unless enjoined, are reasonably likely in the future to violate, Sections 5(a) and 5(c) of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

248.    Enter a Final Judgment permanently enjoining Curtis, Mangan, and Masley from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b) and 13(d) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-1, 13b2-2 and 13d-1 thereunder.

249.    Enter a Final Judgment permanently enjoining Nearen and Kessler from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act, Sections 10(b), 13(a) and 13(b) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-1 and 13b2-2 thereunder.

250.    Enter a Final Judgment permanently enjoining Irni and Gomez from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

251.    Enter a Final Judgment permanently enjoining Behanna from violating, directly or indirectly, Section 17(a) of the Securities Act, Sections 10(b), 13(a) and 13(b) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-1 and 13b2-2 thereunder.

252. Enter a Final Judgment permanently enjoining Varsi from violating, directly or indirectly, Section 17(a) of the Securities Act, Sections 10(b), 13(a) and 13(b) of the Exchange Act and Rules 10b-5, 12b-20, 13a-13, 13b2-1 and 13b2-2 thereunder.

253. Enter a Final Judgment permanently enjoining Milligan, Lipkin, Shainberg, Shatles, Lyons, Orr, Vinci and Noel from violating, directly or indirectly, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, thereunder.

254. Enter a Final Judgment requiring Curtis, Mangan, Masley, Nearen, Irni, Gomez, Kessler, Milligan, Lipkin, Shainberg, Shatles, Lyons, Orr, Vinci and Noel to account for and disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

255. Enter a Final Judgment assessing civil penalties against Curtis, Mangan, Masley, Nearen, Irni, Gomez, Kessler, Behanna, Varsi, Milligan, Lipkin, Shainberg, Shatles, Lyons, Orr, Vinci and Noel pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

256. Enter an Order permanently barring Curtis, Mangan, Masley, Nearen and Kessler, pursuant to Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act, from serving as officers or directors of any issuer that has a class of securities registered under Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

257. Grant such further and other relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands

a trial by jury for all issues so triable.

Dated: New York, New York
       November 10, 1999

Respectfully Submitted,

ROBERT B. BLACKBURN (RB-1545)
Associate Regional Diirector

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION

Northeast Regional Office
Seven World Trade Center, 13th Floor
New York, New York  10048
(212) 748-8185
(212) 748-8045 (facsimile)

Of Counsel:

Carmen J. Lawrence
Eric M. Schmidt
David Rosenfeld

**GRAUBARD DECL. EX. 1**                                        **SEC049**