1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     ) File No.:  NY-6315
TRADING IN THE SECURITIES OF         )
ORGANOGENESIS, INC. AND CERTAIN      )
OTHER ISSUERS                        )

                            Thursday
                            September 5, 1996

                            Securities & Exchange
                            Commission
                            Seven World Trade Center
                            New York, New York 10040


        The above-entitled matter came on for hearing,

pursuant to notice, at 10:25 a.m.


        APPEARANCES:

        On behalf of the Securities & Exchange Commission:

        STEPHANIE AVAKIAN, ESQ.
        Staff Attorney
        WILLIAM F. JOHNSON, ESQ.
        ANTHONY RAGOZINO, ESQ.
        Seven World Trade Center
        New York, NY 10040
        (212) 748-8231


        On Behalf of the Witness:

        MARANDA E. FRITZ, ESQ.
        FRITZ & MILLER
        565 Fifth Ave.
        New York, NY  10017
        (212) 983-0909




                    BAYLEY REPORTING, INC.


**GRAUBARD DECL. EX. 31**                              **SEC170**

2

<u>I N D E X</u>

<u>WITNESS:</u>                          <u>EXAMINATION:</u>

Joshua Shainberg                            3


<u>EXHIBITS:</u>          <u>PAGE</u>      <u>DESCRIPTION</u>

<u>Commission's</u>

    1 (prev. marked)    4        NY6315 - Commission's
                                 Supplemental Information
                                 Form Number 1662

   67 (prev. marked)            Account Statements -
                                 Quintella

   68 (prev. marked)            New Account Form

   70 (prev. marked)            Trading Records - Alta

  100 (prev. marked)            Subpoena Duces Tecum

**GRAUBARD DECL. EX. 31**                                    **SEC171**

3

P R O C E E D I N G S

MS. AVAKIAN:  We are on the record at 10:25 a.m.,
on September 5, 1996.

WHEREUPON,

JOSHUA SHAINBERG

having been first duly sworn, was called as a
witness herein, and was examined and testified as follows:

EXAMINATION

MS. AVAKIAN:

Q    Please state and spell your full name for the
record.

A    Joshua Shainberg. J-O-S-H-U-A, S-H-A-I-N-B-E-R-G.

Q    Thank you.  Mr. Shainberg, I am Stephanie Avakian
and with me is William Johnson and Anthony Ragozino.  We are
officers of the Commission for the purposes of this
proceeding.

This is an investigation by the United States
Securities and Exchange Commission In the Matter of Trading
in the Securities of Organogenesis Inc. and Certain Other
Issuers.  The purpose of this investigation is to determine
whether there have been violations of certain provisions of
the Federal Securities Laws.  However, the facts developed
in this investigation might constitute violations of other
state, federal, civil or criminal laws.

Prior to the opening of the record, you were

BAYLEY REPORTING, INC.
(202) 234-7787

4

provided with a copy of the Formal Order of Investigation in
this matter.  It will be available for your examination
during the course of this proceeding.

     Q    Have you had an opportunity to review the Formal
Order?

     A    Yes.

     Q    Prior to the opening of the record, you were also
provided with a copy of Form 1662, the Commission's
Supplemental Information Form.  That has previously been
marked as NY6315, Exhibit Number 1.  Have you had an
opportunity to review exhibit number 1?

     A    Yes.

     Q    Do you have any questions concerning this
exhibit?

     A    No.

     Q    Mr. Shainberg, are you represented by counsel
today?

     A    Yes.

     MS. AVAKIAN:  Would counsel please identify
themselves by name, firm name, address and telephone number?

     MS. FRITZ:  Maranda Fritz.  The firm is Fritz &
Miller, 565 Fifth Avenue, New York, New York 10017, phone
number is (212) 983-0909.

     MS. AVAKIAN:  Ms. Fritz, are you representing Mr.
Shainberg as his counsel today?

5

                    MS. FRITZ:  Yes.  I am.

                    BY MS. AVAKIAN:

        Q    Mr. Shainberg, this is a copy of a Subpoena Duces
Tecum that has been previously marked as NY6315, Exhibit
Number 100.  Is this a copy of the subpoena that you are
appearing pursuant to today?

        A    Yes.

        Q    Mr. Shainberg, this subpoena calls for the
production of certain documents.  Have you tendered to the
staff the documents called for by this subpoena?

        A    Not as of today.

                    MS. FRITZ:  If I could respond to that.  We
indicated to you, off of the record, that we have gone over
the subpoena.  The documents relating to the underlying
transactions in the stocks listed there, are no longer in
Mr. Shainberg's possession.  He will provide to me, by the
end of next week, copies of his tax returns for this period.
 As well as the bank records that he has retained.

                    MS. AVAKIAN:

        Q    Were there documents responsive to this subpoena
that exists, that are not in your possession any longer?

        A    I believe, in reference to one of these names
here.  Walter Sales Company, Inc., Number Three, on Page
Two, Section F, Number Three.  I had some papers and
documents related to this company, on or about year ago.  I

                    BAYLEY REPORTING, INC.
                      (202) 234-7787

6

do not recall the names.

        Q    What types of papers did you have?

        A    I had some new due diligence paperwork which the
brokers and the salesmen would send out to customers.  Such
as news releases and things of that nature.

        Q    Where did you get those documents?

        A    I got those documents from Ted McKay, the
president of Securities Plans.

        Q    Where there any other documents?

        A    Not that I recall.  I remember that there were
two or three pages.  One was definitely a news release from
the company itself for sales.  And one or two pages were
related to what the company did in general.

        Q    Were there any other documents requested in the
subpoena that you previously had in your possession, but do
not have anymore?

        A    No.  I don't believe so.  It related to the
companies and the persons outside of all the sales.

        Q    Are any documents being withheld based on any
claim or privilege?

            MS. FRITZ:  No.

            BY MS. AVAKIAN:

        Q    Would you please state your date and place of
birth?                    REDACTED

        A    ███████  1956.  New York City.

                BAYLEY REPORTING, INC.
                   (202) 234-7787

**GRAUBARD DECL. EX. 31**                                    **SEC175**

# REDACTED

Q    And your social security number?

A    ████████████

Q    Have you ever been known by any other name?

A    No.

Q    Did you attend college?

A    Yes.

Q    Where did you go?

A    Brooklyn College and Barrow College.

Q    When?

A    1975.

Q    Did you receive a degree?

A    I did not receive a degree.

Q    Do you have any professional licenses?

A    Yes.

Q    What licenses?

A    Series 7, Series 24, Series 63 and Series 27.
Those are the professional licenses.

Q    Are you married?

A    No.

Q    Have you ever been married?

A    No.

Q    Are you presently employed?

A    No.

Q    When were you last employed?

A    I was working with American Investors Services up

GRAUBARD DECL. EX. 31                              SEC176

8

until August 23, 1996.

    Q    How long were you there?

    A    I was there for approximately three months.

    Q    What did you do while you were there?

    A    I was doing compliance work for a branch office.

    Q    Is that branch office still in existence?

    A    No.

    Q    What happen to it?

    A    Basically, it was closed down.

    Q    Why was it closed down?

    A    The brokers left to other firms and I decided to close the firm.

    Q    What was the address of that firm?

    A    114 East 32nd Street, New York City.

    Q    Where you acting as a principal in that firm?

    A    I was acting as a compliance director of the branch office.

    Q    Did you have any equity interest?

    A    I had equity interest.

    Q    How much?

    A    I didn't own stock in the firm, but I was the president of the company and I was a director of the company.  It was understood that I owned half of the firm.

    Q    Who owned the other half?

    A    Mr. Lipkin.

GRAUBARD DECL. EX. 31        SEC177

Q    What is Mr. Lipkin's first name?

A    Michael.

Q    How was the equity interest dissolved when the company went out of business?

A    Since the company really did not have any equity, it was simply dissolved.  Where it would have had equity in the future, we would have split it.

Q    Did Mr. Lipkin have any position within the firm?

A    He was supposedly the partner and the other half interest.

Q    Was he there on a daily basis?

A    Yes.

Q    What did he do at the firm?

A    He supervised brokers.  That was his main job. He had his own book.

Q    Did he have a title?

A    The title on his business card was CEO.

Q    How many brokers did you have there?

A    During the American Investors Services period?

Q    Yes.

A    I would say we had approximately six or seven investor brokers.  It changed during the time.

Q    Who were they?

A    We had a man named Alexander Nuroditsky.  We had a few people that came and left right away.  Marc Huilla.

BAYLEY REPORTING, INC.
(202) 234-7787

14

Q    Do you know if he had customers at that time?

A    I believe he had some customers at that time.
Yes.

Q    What happen to Hubert Rosche being part of
Nutmeg?

A    What do you mean?

Q    Did Hubert Rosche cease being a branch officer of
Nutmeg at some point?

A    Yes.

Q    Was that May of '96?

A    Yes.

Q    And why did that occur?

A    The principals and owners of Nutmeg Securities,
Matthew Rockland, and I believe also his associate and
compliance director, Sherman Jinn, demanded that we do
certain public offerings.  We participated without any
hesitation with one and then another public offering which
did not form well.  We had a discussion in reference to
that.  They come to the conclusion that we should continue
to do their public offerings, and we did not prefer doing
third public offerings, or give instruction which we, I
believe, did only maybe 1500 shares of stock at that point.
 Incidently, that stock was down dramatically within the
first few weeks after the offering came out.  After that
point, we had a parting of ways.  They understood that.

15

Nutmeg understands that the share was not fundable this way,
certainly the way they wanted to.  I understood at that
point that, that's what their intention of having us at the
branch office was.

Q     What did Hubert Rosche do for Nutmeg?

A     He did pro-logic management, instructions and
specific research.

Q     About how many brokers were at Hubert Rosche when
it was part of Nutmeg?

A     I believe we had around 10 to 12.

Q     Who were they?

A     I'll have to get the list.

Q     Do you remember any of them?

A     Well, the names that I mentioned before,
Alexander Nuroditsky, Marc Huilla, I believe was there.  We
had several other people as well.  We had individual brokers
that came over from the previous firms, Securities Planners,
also know as Button Worth Securities to Nutmeg Securities.
Some came over, some did not come over.  The ones who came
over, many of them left right away because they understood,
apparently I didn't.  But they understood right away that
they would have to do these public offerings and not just
maybe Microsoft laws.  Something of that nature that they
wanted to do.  So they left right away.  I'd have to get a
list for you for where each one of them went.

GRAUBARD DECL. EX. 31

16

Q    Okay.  When you were with American Investment
Services, was that with Hubert Rosche, or did Hubert Rosche
cease existence at the time that you stopped being part of
Nutmeg?

A    It was with Hubert Rosche at American Investors.

Q    Is Hubert Rosche still in the active corporation
or partnership?

A    No.

Q    It has since dissolved.

A    As of August 23rd, when I had left and the other
brokers left, American Investor Services was a joint
decision by Michael and myself to cease operations.

Q    What was Hubert Rosche?  A partnership
corporation.

A    Corporation.

Q    Where was it incorporated?

A    New York.

Q    Before Nutmeg, where were you?

A    Securities Planners.

Q    And it was still Hubert Rosche, but you were a
branch office of Securities Planners.

A    Yes.  Not for the entire time but a latter apart.
 Initially --

Q    Go ahead.  What period in time was Hubert Rosche
a part of Securities Planners?

BAYLEY REPORTING, INC.
(202) 234-7787

**GRAUBARD DECL. EX. 31**                                    **SEC181**

17

A    I'll go the other way.

Q    Okay.

A    Initially, I was a broker, registered rep at
Securities Planners.

Q    What time period are we in now?

A    That was between the latter part of the Spring in
1994 to the end of 1994.  The Fall of 1994.  At that time
Mr. Ted McKay, the president of the company, and myself, and
Michael Lipkin, my associate, decided jointly to have a
branch office owned by Michael Lipkin and myself.  And so we
became Hubert Rosche branch office of Securities Planners at
the end of 1994.  That continued on until May of 1995.

Q    Did you change locations once you became Hubert
Rosche?

A    Yes.  In the beginning we were, I believe, for a
very short period of time, down by 30 Broad Street.  Then we
went several months working at 210 Plaza.  That's the
Madison Square Garden Building, of which you -- of which
Securities Planners also maintained one of the floors.  And
later towards the end of the relationship between Securities
Planners and Hubert Rosche, we went to 32nd Street, Park
Avenue.

Q    You mentioned Button Worth.  Where does Button
Worth fit into this picture?

A    The last month that I was at Securities Planners,

BAYLEY REPORTING, INC.
(202) 234-7787

**GRAUBARD DECL. EX. 31**                                    **SEC182**

I don't know the reason, Securities Planners changed it's
name to Button Worth Securities.  I think that was in
August.

     Q    Why did Hubert Rosche cease being a branch
officer of Securities Planners?

     A    It was again, jointly decided that it was not
going very well.  After his work with Securities Planners he
wanted to find a company that had a better track record,
better net capitalization.  We felt nothing at Securities
had that.

     Q    Did Securities Planners ask you to leave?

     A    No.

     Q    Who hired you at Securities Planners?

     A    Ted McKay.

     Q    Did you know him before that?

     A    No.  I did not.

     Q    When did you first meet Mr. Lipkin?

     A    I met Mr. Lipkin at a company called Ed Rimson &
Company, where I was trying to do a public offering for Dale
Rimson and he was a broker there.  We just met and he was in
the board room or Mr. Rimson's office.  He introduced
himself and after realizing that the offering of Dale Rimson
could not take place at Ed Rimson & Company, his advice to
me was finding a company that would underwrite the security.
He thought that it was a very successive - would be a very

GRAUBARD DECL. EX. 31              SEC183

successive offering.  Which was incidently, my opinion the
most successful offering on Wall Street in 1995.  Going to
historical prices and we went to Securities Planners with
all the documents to become the underwriter of that
division.

Q     Going into 1995, when you were with Hubert Rosche
and that was part of Securities Planners.  What was your
position with Hubert Rosche?

A     I was the partner and compliance manager.  I was
also the, officially appointed, the record branch manager.

Q     Did you have any customers?

A     I had customers at Securities Planners.  Yes.

Q     About how many?

A     I would say I had 200 customers.

Q     Did you actively trade for them?

A     Yes.  I approximately had 200 customers and I
worked with them.  But during that time I felt that my role
as a branch manager and as a compliance manager was
occupying most of my time.  So I gave my customers away to
the brokers that worked for us.

Q     About what time period did you give your
customers away?

A     During the time prior and during the time of the
offering of Neil Grassoff which took place in May of '95.
So I would say between the beginning of 1995 and May of

BAYLEY REPORTING, INC.
(202) 234-7787

20

1995.

Q    What was your rep number when you were at Securities Planners?

A    I'd have to look at it.  I haven't seen that in a long time.  I think it was 079, but I would have to look at it.

Q    Okay.  When you say you gave your customers away, did you give them away completely, or did you still have a hand in what they were doing?

A    I gave them away completely.

Q    Were there any that you retained?

A    No.

Q    Did you have any involvement at all with any of their accounts once you gave them away?

A    Sure.  I was the compliance manager, so obviously I had to talk to them.  Not to sell them securities, but to find out their problems and needs, their concerns.  As I would with any other brokers customers.

Q    What did you do as the head of compliance?

A    I would -- well, if the need arose, a customer would call up and there was a dispute orally between the -- verbally between the customer and the broker, usually if there was, it was a differential of ten cents on a $15.00 trade, or the exact name of a company, or things of that nature: how come my trade was done on Tuesday, it should

GRAUBARD DECL. EX. 31

have been done on Monday, when the client realizes that he

dated the check on Tuesday.  Those are the general things

that you, as a compliance officer, would go through.  If it

became more serious than that, where a customer would not

like the security he bought, even though he paid for it: we

try to resolve it and if it came to that level, I would

generally give it over to Mr. Ted McKay to speak with the

customer.  That rarely happen.

      Q     Was there a compliance manual?

      A     Yes.

      Q     Who maintained it?

      A     We had the compliance manual in the branch and of

course there was a compliance manual in the Securities

Planners main headquarters.

      Q     Who maintained the one within the branch?

      A     I maintained it.

      Q     Was that compliance manual specific to Hubert

Rosche, or was it specific to Securities Planners?

      A     It was specific to Securities Planners.  It was a

standard branch manual that I was under the assumption they

gave to all their branches.

      Q     How were you paid when you were part of

Securities Planners?

      A     At the branch, we were given -- Hubert Rosche was

given by Ted McKay's company, Securities Planners, a

22

commission check based upon an eighty percent/twenty percent split where if you would have, if a broker would write a ticket to buy some, hypothetically, a 100 shares of XYZ Corporation and the commission would be $100.00. Quintella & Company, the clearing company, would take off their clearing charges, assuming it was $25.00. The remaining $75.00 would be sent to Ted McKay and Securities Planners to their commission account with a break down designating which branch, which broker, did that trade. Securities Planners would then take twenty percent off that $75.00 ticket and send us the remaining eighty percent.

Q    And then how --

A    And then we would then give it to -- Rosche would split the half exactly whatever the remaining was. Give that to the broker and maintain the other half.

Q    And what did Hubert Rosche do with the half that it maintained?

A    It paid its expenses.

Q    And were you paid in any manner differently than the reps? You personally.

A    With the remaining half that would come from that eighty percent, of whatever was left over, that came to Securities Planners, we would get forty percent. Michael and myself and the reps would get their forty percent. And forty percent again, that Michael and I would get would pay

BAYLEY REPORTING, INC.
(202) 234-7787

23

expenses.  If there was anything left over, then we would
have an income.

Q    Did you get a regular payment from Hubert Rosche?
You personally.  At certain times, did you show profit?

A    No.  It wasn't a certain time of the month.  It
was at different times.  Generally, we were suppose to get
paid by Securities Planners at a certain time of the month.
Which didn't happen too often.

Q    And that was from the commission monies.

A    Correct.

Q    Who set the commission rates when you were part
of Securities Planners?

A    Are you referring to the 80/20 agreement, or the
50/50?

Q    The commission rates that were charged to the
customers.

A    That was set by policy by Securities Planners up
to a certain amount of money, minimum commission per charge
and maximum commission per charge.

Q    Do the commissions vary depending upon where the
stock was traded?

A    The commissions varied based upon a solicitation
versus non-solicitation.  A customer calls you up and they
want to buy something, you'd give them the discount.  If you
would solicit them, you would give them maybe a slight

GRAUBARD DECL. EX. 31                                    SEC188

discount.  If it was a boxed transaction, you would give
them a discount to the normal agency business.  But we had a
form that has been addressed by Quintella of several pages
that will tell you, as all brokers companies do, what the
normal commission would be per transaction per dollar.

Q    Did you make a market in any securities?

A    I don't believe Securities Planners made a market
at the time we were there.  I believe they were looking to
make markets, but not while we were there.

Q    Did you clear it through Quintella?

A    Yes.

Q    Did Quintella make a market in any securities?

A    I don't know.

Q    What type of clearing arrangement did you have
with Quintella?

A    I didn't have any clearing arrangement.  I was
Securities Planners and I had no idea what the arrangement
was except the financial arrangement that I just mentioned.

Q    Can you take me through generally when someone,
say a customer, would call and say either buy or sell
something.  What logistically would occur within your
office?  Starting with the broker would write it down on an
order ticket or something like that.

A    The broker would write the order ticket assuming
it is an existing account.  The ticket would then go to a

GRAUBARD DECL. EX. 31

25

man named Jim Berg's desk who was considered the operations manager of the branch.

Q    Could you spell his last name?

A    B-E-R-G.  I believe he goes by that name on his NASDAQ, as well as the longer name that is shortened but his real name is Jim Berg.

Q    Do you know the longer name?

A    No.  I would also see the ticket.  So Jim Berg would then input that into a book, a trade manual book.  I would see the ticket as well.  If it's an existing account, I would see if it is solicited or non-solicited for the one he traded this for.  It would then be faxed to the main office of Securities Planners to the direction of Lynn Schultz, who is the head trainer.  Lynn Schultz would -- if it was a very large transaction show it to Ted McKay.  If it was just a normal size transaction, he would do the transaction and cut the check.

Q    What was considered a large transaction?

A    Something over $10,000.00.

Q    How would you know whether the trade occurred? Did they send a confirmation?

A    A confirmation would come back from Lynn Schultz. First verbally, and then either later that afternoon or the next morning through a copy of the order ticket.  That was being sent to the customer.

26

Q    Who sent the account statements to the customers?

A    Quintella & Company.

Q    Did you ever get a copy of those account statements?

A    Yes.

Q    How often?

A    We supposedly -- we were suppose to get it once a month, but unfortunately we got it very often once every three months, sometimes once a month.  I'll explain that. If it was a new account, with a first trade, we would get it the following month.  But if a trade was not done more than once or twice a year, it was their policy, as it is with many brokerage companies and clearing firms, only to send out once every three months a statement.

Q    How did the reps at Hubert Rosche keep track of their customers positions?

A    They would get a copy of -- well they would know, of course, after they wrote the order ticket by having their own books and they would also get a copy of each and every trade ticket that was sent to the customers, and they would see that whether they kept it, or whether they gave it back to Jim Berg is at their discretion.

Q    In the beginning at Hubert Rosche when you had your own customers, did you keep customer books?

A    Yes.

BAYLEY REPORTING, INC.
(202) 234-7787

27

Q    What happen to them?

A    Well, when I left this -- you did mean at Securities Planners --

Q    Yes.

A    I gave those books back to Ted McKay.  Most of the records -- Ted McKay requested them.  Explained that they were his.

Q    Is that standard when you leave a brokerage firm?

A    Yes.  We did maintain some records which we brought to Nutmeg Securities.

Q    What types of records did you keep?

A    Some of the records.  Some books and records and bills.  Certainly bills that would not -- which were agreed upon by Ted McKay and our firm that he would pay, that he didn't pay.  Like commission schedules.  So if possibly in the future we would suggest to getting that commission which he request, but did not get.

Q    Did you ever try to get it?

A    Oh sure.  With your offices.  With the NASD and other offices and unfortunately we got no response.

Q    What happen to those records that you took with you to Nutmeg?

A    We had some records at Nutmeg and records beyond that went to -- some records we had to give back to Nutmeg and then we went to American Investors and some records went

GRAUBARD DECL. EX. 31                                                    SEC192

33

Q    Anyone else?

A    It is possible that Lynn Schultz might have been there.

Q    She was the head trader.

A    He.

Q    He.  I am sorry.  He was the head trader.

A    He was the head trader.

Q    At Securities Planners.

A    At Securities Planners.

Q    You said that among Alta Sales, Mr. Irangy promoted other stocks.  What were they?

A    I don't know.  He mentioned many different things.  But then he specifically said and the stock that I would like promote at Securities Planners is Alta Sales. And then he --

Q    Had you ever heard of any of the other stocks that he said he promoted?

A    I don't even recall what they are.  Looking at your names here, I don't recall any of these names.

Q    The names on the subpoena you mean.

A    That's correct.

Q    Had you ever heard of Alta Sales?

A    Prior to that day.  No.

BY MR. JOHNSON:

Q    The other people that you think were there, Mr.

GRAUBARD DECL. EX. 31                                      SEC193

34

Lipkin, Mr. Doyle and Mr. Schultz.  Do you know whether they
were invited to come?

    A    Well, Mr. -- I don't know the answer to that.  I
don't know if they were invited or not.  Mr. Lipkin would
come with me on occasion, as his role as part of the branch
office.  I could only assume that Lynn Schultz was there
based upon the fact that he was head trader.

        BY MS. AVAKIAN:

    Q    The next meeting was the presentation.

    A    Correct.

        BY MR. JOHNSON:

    Q    Not his one.

    A    No.

    Q    Okay.  At that meeting, or before that meeting,
did Mr. McKay or any of these other people, that were there,
say that they had been invited by Mr. McKay, or did Mr.
McKay say that he invited them?

    A    No.  No.  When I came there to speak to Mr.
McKay, he introduced Ray Irangy and Ray Irangy just said, I
promote stocks.  I'm promoting this one at the time, not
just at Securities Planners but other places just as well.
Then when we came back at the next meeting, at that point,
there were several brokers there.  I know that there were
salesmen and other branch officers.  I don't recall the
names.

                BAYLEY REPORTING, INC.
                   (202) 234-7787

35

Q    Before you get to that, let me just ask a couple
more questions.  What did Mr. Irangy look like?

A    He was a stocky gentleman.  Slightly balding.

Q    About how old was he?

A    Late 40's.  He was maybe five foot, seven or
eight.  He was, I believe, of middle eastern extract.  Any
other questions about him?

Q    What did he say about himself?  What he did?
What his background was?

A    He said he was a promoter.  I was more interested
in his qualifications based upon the recommendations of
Securities Planners, Ted McKay, then what any promoter might
say who works at Securities Planners.  The interest I had of
what Ray Irangy might say, is being the PR man or the
promoter of the stock.  I was more interested in the stock
than Ray Irangy.

Q    But did he say anything else about his
background?  Or what he did?

A    He said he was a promoter.  He said he knew many
brokerage companies, and many people, and many invitations.
 And it sounded impressive to me.

BY MS. AVAKIAN:

Q    Did he say that he worked for Alta Sales?

A    No.  He did not.

Q    Did you form any opinion about who he worked for?

BAYLEY REPORTING, INC.
(202) 234-7787

36

A     There are many people on Wall Street that call themselves promoters and work for themselves.  Never for a brokerage companies or for stocks.  Or if they do, they never reveal that. I did not form any opinion outside of him being a promoter of that particular stock.

Q     Did he speak with an accent?

A     He had a slight accent.  Yes.

Q     What did it sound like?  Could you pick out where it was from?

A     That is the reason I said I assumed he was middle eastern extract.  It sounded a little eastern.  Don't ask me the country.  I wouldn't know.

Q     Was it normal for Lynn Schultz to be at one of these weekly meetings?

A     He was very often at meetings because he would like to know what stocks Securities Planners are promoting. Not to just buy himself stock.

Q     Was it normal after weekly meetings with Mr. McKay to have a stock promoter present?

A     No.  It wasn't normal.  That might have happen once a month.  My weekly meetings with Mr. McKay was technical.  About accounts, about stocks we were doing, about commissions, about problems that I might have.  And once in a while we would have a promoter there promoting their stock.

GRAUBARD DECL. EX. 31                                            SEC196

40

Rosche was a part of Securities Planners, was Mr. Lipkin

there on a daily basis?

     A     Yes.

     Q     And did he have customers while you were at

Securities Planners?

     A     Yes.

     Q     And did he actively trade in their accounts?

     A     Yes.

     Q     Now jumping forward again.  Before the break, we

were speaking about your first meeting with Mr. Irangy which

was in Ted McKay's office.  What did Mr. Irangy say about

Alta Sales?

     A     He said he was promoting a company.  I don't

recall exactly today what the company was involved in.  I

believe it was a technology company.  To the best of my

recollection, he said that it had changed business strategy,

or direction from a normal BO type company, or steel

company: to some kind of manufacture company, to a

technological company.  So apparently the other deal either

was spun off, or was not successful and the new company was

doing technology.

     Q     Did he say anything about potential earnings?

     A     I don't recall anything about earnings, revenues

or assets.  I do recall that there were documents.  There

was definitely a news release.  At least one.  And there was

GRAUBARD DECL. EX. 31                                    SEC197

41

some type of promotional material.  Possibly a glossy of

other company's products and potential.

        BY MR. JOHNSON:

    Q    Were those documents that Mr. Irangy had and gave

to you --

    A    Ted McKay.

    Q    Ted McKay had the documents.

    A    Yes.

        BY MS. AVAKIAN:

    Q    Any public filings?

    A    I don't recall if there were any 10-Q's or 10-K's

or similar financial bonds with the SEC.

    Q    Did he talk about any potential acquisitions?

    A    I don't recall exactly what it was.  It was a

technology company.  It was a brief meeting.  This was the

second meeting we had.  The first meeting that we had, we

were just introduced to him.

    Q    Okay.  I thought we were on the first meeting.

    A    No.  The first meeting was just introducing him.

 He said he was promoting many different companies.  He

might have mentioned a few.  He mentioned a few names.  One

of them was Alta Sales.  Great to meet you.  Then I had my

conversation with Ted McKay, my weekly constitutional with

Ted McKay.  The next time I came, he gave his promotion.

    Q    And when was this?

GRAUBARD DECL. EX. 31        

42

A    This was a week or ten days, I believe after that meeting.

Q    So we are still in the Spring of '95.  That time period.

A    Sometime around then.  Yeah.

BY MR. JOHNSON:

Q    At or after the first meeting, did Ted McKay comment about Ray Irangy in anyway to you?

A    Prior to the second meeting, he had mentioned to me that by the way, today when we meet, Ray is going to talk to you about Alta Sales.  So that day, I believe, I knew that he was going to give his promotion.  That's why I came down with **072----------**

Q    And at that or any other time before that, did Mr. McKay comment about who Mr. Irangy was?

A    At the first or second meeting?

Q    Right.

A    I don't recall any comments.

BY MS. AVAKIAN:

Q    So the second meeting was about ten days after the first meeting.

A    A week to ten days.

Q    Okay.  Who was at the second meeting and where was it?

GRAUBARD DECL. EX. 31                                    SEC199

A    That was at the same location.  Ted McKay's
office.  I believe Michael was there, Michael Lipkin, I
don't know for how long.  I believe Aden Doyle was there, I
believe Lynn Schultz was there, Ray Irangy, Mr. McKay and I
believe that there were two or three other people that I did
not recognize.  Apparently they were branch officers, stock
brokers, or staff members working for other branches, or for
the headquarters of Securities Planners.  So he was
promoting it not just to my branch, but to other branches.

Q    And what did he say?

A    He promoted his issue.  It sounded impressive.
His promotion was who he knew.  Many different companies
that he was going to, not just Securities Planners, to
promote this issue.  Many of the brokerage companies, I
don't recall exactly the names, but there were many
different companies.

Q    Do you recall who he said he knew?

A    He said he knew, but I don't recall the names --
 but he said he knew the heads of institutional firms.  He
mentioned a few, but I don't recall the names.

BY MR. JOHNSON:

Q    Had you heard of those firms before when he
mentioned them?

A    I remember they impressed me, so I must have
heard of them.  He mentioned that he knew or was associated

44

with very prominent people in the Middle East.  It impressed

me.  Although I don't know the names of, except the

presidents of certain countries in the Middle East, the

prime ministers, which he did not mention.  He did mention

some important names.  Apparently in the newspaper or so.

Major names.  Possibly the Royal family of Jordan or

something like that.  I'm just assuming.  But I've heard of

those names.

        BY MS. AVAKIAN:

Q    So the names he said, you had heard previously.

A    Heard, read about.  Major names.

Q    Did he say he was related to any of them?

A    No.

        BY MR. JOHNSON:

Q    Just to clarify.  Was it your impression that the

names he was mentioning were business people or sort of

political people?

A    Both.

Q    Okay.

A    I think in the Middle East, one goes with the

other.

        BY MS. AVAKIAN:

Q    What else did he say?

A    He promoted Alta Sales.

        BAYLEY REPORTING, INC.
           (202) 234-7787

45

Q    Did you know what the stock price was then?

A    He mentioned it to me and to the group.  It was
$6.00 a share.  Something of that nature.  I'd have to look
at my records.

Q    Did he give any projections on where the price
was going?

A    He didn't say the price was going anywhere.  But
he told us that based upon on the fundamentals, I'm telling
you the company is going to succeed in his belief.  And
subsequently the market makers price should go forward.

Q    Did he claim to know anyone from the issuer?

A    What do you mean by the issuer?  The company --

Q    From Alta Sales.

A    Alta Sales.

Q    Yes.  I am sorry.

A    I don't recall him mentioning any names.  I'd
have to look at the documents again to get a better
recollection, if we have those.

Q    You said that Ted McKay had some documents on
Alta Sales on that time.

A    Yes.

Q    What did he have?

A    He had a news release and he had some promotional
material.  I believe one was a glossy, like a fold out
glossy.  I don't recall seeing a 10-K or a 10-Q.  And I

GRAUBARD DECL. EX. 31                                          SEC202

46

certainly don't have that because I looked at my records.
But there were a few documents.

Q    Did he ever --

A    Two or three.

Q    Were there any charts on price movement?
Anything like that?

A    I don't recall seeing any charts like that.

Q    What else happened at that meeting?  Anything
else?

A    It was your typical promotional meeting by a
promoter to a brokerage company.

Q    Did Ted McKay say anything at the meeting?

A    Ted McKay just basically said that he had, like
he always would say, he had looked into the company and did
his due diligence.  He believes that the company has a lot
of potential and he would like to see everybody in
Securities Planners get involved.  And that was it.

Q    How did the meeting end?

A    Something like that.

Q    Did you speak to Ray Irangy personally at that
meeting?

A    No.  I just said hello.  He didn't know me from
before.  I'm sorry.  I have to clarify that.  I met him the
week before when I was in town.

Q    Did Mr. Irangy leave the meeting first, or did

BAYLEY REPORTING, INC.
(202) 234-7787

47

you leave the meeting first?

        A    I don't remember.  I probably stayed and had my,
you know, talk with Ted McKay after that.

        Q    Once Mr. Irangy had left.  Did Ted McKay ever
encourage you or anyone else in your presence to push the
sell of Alta stock?

        A    As I said, he recommended that he promote the
stock, sell the stock to our customers.  I don't know what
you mean by pushed.

        Q    Recommended.  Same thing.

        A    He recommended.  Yes.

        Q    Same thing.  Did he do it in Mr. Irangy's
presence?

        A    I believe he said it in Mr. Irangy's presence.
The statement that I made to you before and afterwards, when
I assume Irangy left.  I had my private conversation with
Ted McKay about the day to day operations, the previous
week, Hubert Rosche and we talked about other matters.

        BY MR. JOHNSON:

        Q    In your dealings with Mr. McKay, how often did he
gather you together with anyone else from your branch and
say that you should promote a particular stock?

        A    Once a month.

        Q    And when he did that, did he ever bring in anyone
like Mr. Irangy or was anyone like that there?

                    BAYLEY REPORTING, INC.
                        (202) 234-7787

48

A     Sure.  Absolutely.

Q     So this was not unusual?

A     Not at all.

Q     Was there anything about this particular stock
and this particular meeting that was different from other
situations?

A     At that meeting.  No.

Q     At a later point?

A     At a later point, we didn't have a meeting.  But
at a later point when the stock went down, I felt different.

Q     Okay.

A     Well, I was upset.  Obviously.

      BY MS. AVAKIAN:

Q     About how much later was this when the stock went
down?

A     I think about a month later the stock started
going down, so I had a little concern.  I spoke with Ted
McKay in my weekly meetings and he had no answer.  He just
said well, if you don't want to continue to do it, don't do
it.  Evidently we stopped doing it.  For a short period of
time nobody promoted it.

Q     Okay.  Jumping back then to after the second
meeting.  Did Securities Planners or Hubert Rosche have any
types of policy with regard to recommending stocks?

A     Yes.

GRAUBARD DECL. EX. 31                                        SEC205

49

Q    What were they?

A    Hubert Rosche would take direction from
Securities Planners.  If Hubert Rosche would see something
it liked, they would have to show it to Ted McKay and Ted
McKay would have do his due diligence and approve it.  And
if he didn't approve it, it wasn't done.  Generally the
stocks we did at Securities Planners were recommended
initially by Securities Planners and Ted McKay.  Almost all
the time.

Q    Did you have to get approval from Ted McKay to
buy or sell any stock in a customer's account?  Meaning if a
customer --

A    Per trade or if he had stock?

Q    Every stock.

MR. JOHNSON:  Like Microsoft or something?

BY MS. AVAKIAN:

Q    For example, if a customer called a rep in your
office and said I want to buy stock XYZ and that wasn't a
stock that you normally recommended, would you then have to
call Ted McKay, and say look this customer wants to buy
this, is that okay?

A    I'll answer it this way.  If it was non-
solicited, I would not have to, nor the rep would not have
to call Ted McKay.  If it was solicited, it would only be
done with prior knowledge of Ted McKay.

GRAUBARD DECL. EX. 31                                    SEC206

50

Q     Thanks.   Did Hubert Rosche recommend Alta Sales
to customers?

A     Yes.

Q     How did he go about doing that?

A     He'd call up potential customers and current
customers and tell them the story.

Q     Before we get to that.   How did the reps find out
that they were suppose to recommend Alta Sales?

A     Well, during that time we didn't have that many
reps.   They were given material that we said was given to us
by the headquarters.   Like Ted McKay himself would speak to
these reps over the phone once in a while which was
perfectly acceptable with me.   It was not a big office, and
that's how they found out.

Q     At that time, who were the reps in your office?

A     Again, I would have to get a list.   We had a guy
named -- well, we had -- we had Alexander Nuroditsky, we had
Leonard Burns, we had Jimmy Berg, Michael Lipkin, myself,
Aden Doyle, and there was a few others.

Q     Did you have any cold callers in the office?

A     We had some cold callers.   Yes.

Q     Were the cold callers employed by Hubert Rosche,
or were they employed by the individual reps?

A     They were employed by the individual reps.

Q     And they were paid by the reps.

GRAUBARD DECL. EX. 31                                    SEC207

51

A    They should have been paid by the reps.  Yes.

Q    Were they always paid by the reps?

A    I think one time, a rep and a cold caller had a disagreement because he didn't want to work for that rep, he didn't want to work for that rep anymore.  He wanted to work by himself, because he was just about to take the license or he wanted to work.  Knowing exactly what happen, he went to work for another rep and so there was a political disagreement.  So that rep didn't want to pay him that weeks salary or whatever, so I think we paid him.

Q    So in the case of Alta Sales, how did the reps and the cold callers find out about Alta Sales?

A    They found out after our meeting.  They found out from me, from Michael Lipkin, from Aden Doyle, from the people who were at that meeting who worked with us.

Q    Did you hold a meeting?

A    Yes.  Sure.

Q    Was everyone present at the meeting?

A    Yes.

Q    And who did the speaking at the meeting?

A    I believe Kate had made a speech about it.  Then anyone who had questions asked me and Aden the questions.

Q    What did Aden say about the Alta Sales?

A    Simply towards what Ted McKay and Ray Irangy said.  He said, well this is the company, here are the

BAYLEY REPORTING, INC.
(202) 234-7787

52

documents that Securities Planners approved this for sending
out and this is what you say to the customer. Generally we
did not have a pre-arranged pitch. We had one page. You'd
get on the phone and you say, one, two, three, four, five
and six. They would take notes and they would say it over
the phone to the customers and we would basically, Michael
or Aden would supervise these people to what level they
could say certain things. Generally what they would say is
what is written in the documents.

  Q Was this for the cold callers and the reps?

  A This was for the reps. The cold callers are cold
callers.

  Q And they get the instructions from the reps.

  A Yes. But the cold callers operate differently
than the reps. They sell differently than the reps. They
don't sell. They cold call. And they get customers and
leads. Excuse me, those leads have a very specific fine
NASD guide line level and when you get to that point that a
customer says, why don't you send me some information about
a deal you're doing. Now at the time, that cold callers is
about to tell them what we are doing now. He gives it to a
rep. That is a solicitation whether it was a trade or not.
 We don't get over that level.

  Q When you held the meeting where Aden Doyle spoke
about Alta Sales. Did he say anything about Ray Irangy?

GRAUBARD DECL. EX. 31        SEC209

53

A    He said he met with Ray Irangy and that he was promoting it to many of the brokerage companies apparently.

Q    Was there ever any understanding as to how much Alta Sales you were suppose to try to sell?  Was there a certain amount of money you were trying to raise?

A    No.  This was publicly traded stock, as opposed to a public offering.

Q    Did either Ted McKay or Ray Irangy, at any point, say we are trying to raise a half million dollars for the company?  We are trying to raise $25,000.00 for the company.

A    No.  They just said, go to it boys.

Q    Did you ever have any understanding as to whether Ted McKay was getting any type of compensation from anyone for encouraging other branches to sell Alta Sales?

A    Outside of the agency commission the company got from us and Quintella, no.

Q    Ever any understanding as to whether anyone was getting any money from Ray Irangy or Alta Sales or anyone else?

A    Absolutely not.

Q    Did Securities Planners make a market at Alta Sales?

A    At the time, I don't think Securities Planners made a market in any stocks.  I know they had, at least I was told by Ted McKay, that they had an application in with

BAYLEY REPORTING, INC.
(202) 234-7787

**GRAUBARD DECL. EX. 31**                                    **SEC210**

54

the NASD to start to make markets and that they were looking

as his net cap and had a restriction letter from the NASD.

That's all I know.

Q    You said that some of the information you

received about Alta Sales included a press release of some

type.

A    There was a news release.

Q    News release.

A    At least one.  I don't recall what it said.

There was a positive news release from the company itself.

And there was one or two other documents.  Again, brochures,

I guess printed by the company itself.

Q    Do you know whether Dan Dorkman ever spoke about

Alta Sales?

A    I heard of the name, but I haven't seen any

documents.

Q    You heard of the name, Dan Dorkman.

A    Yes.  Constantly heard of the name in the

newspaper.

Q    Do you know who Dan Dorkman is?

A    I've read his articles in the newspaper in the

past.

BY MR. JOHNSON:

Q    You mentioned, I think, that Ted McKay told you that

he did some due diligence in Alta Sales.

GRAUBARD DECL. EX. 31                                    SEC211

55

A    Yes.

Q    Did your branch rely exclusively on Ted McKay and his people to do all the due diligence for any of the stocks that were sold?

A    We had to.  That's the law.

Q    Did your branch do any independent due diligence?

A    When we were doing a public offering called Neil Grassoff, since I had done a lot of independent research prior to joining Securities Planners, I had a tremendous amount of due diligence that I had done and other people had done.  So I gave that over to Ted Mckay and he further wanted to research with his attorneys.  Outside of that, all of the research documents, not only would have to be approved, but would have to be received and certainly initialed by Ted McKay.  There have been occasions where a company would send us a package, you know.  Microsoft would send you a package or something else only because Ted McKay would not have an analytical report.  It's analytical department was lacking those issues.  So we would call up the investor relations department of one of these NASD stock exchanges.

Q    To your knowledge, did anyone other than Ted McKay or anyone in his office, do any due diligence on Alta Sales?

A    Yes.  Based upon Ted McKay, he said he did the

GRAUBARD DECL. EX. 31                                    SEC212

56

due diligence.

    Q    No.  I am saying anyone other than him.

    A    I don't recall any other names.

    BY MS. AVAKIAN:

    Q    Have you ever heard of the term float?

    A    Float is how many shares they are in the market.

    Q    Did you ever know what Alta's float was?

    A    No.

    Q    Have you ever heard the term market
capitalization?

    A    Yes.

    Q    What is your understanding of what that means?

    A    Outstanding shares in terms of present stock.

    Q    Did you ever know what Alta's market
capitalization was?

    A    Probably we were given a figure, but I don't know
right off-hand.

    Q    Did you ever know what their earnings were?

    A    I'm not aware of that.

    Q    Did you ever know what they were?

    A    I'm not sure.  It might have been on one of the
documents, but I'd have to see them again.  That's all I
know.

    Q    Did you know whether Alta ever did a reverse
split?

BAYLEY REPORTING, INC.
(202) 234-7787

57

        A    No.  I do know though that there was a statement
by Ray Irangy at the meeting that it did have another name
prior to that name Alta Sales.  I don't recall what the name
was.

            BY MR. JOHNSON:

        Q    Is that the name that you would associate with
the manufacturing?

        A    Yeah.  The automobile company.  I think that was
the one.

            BY MS. AVAKIAN:

        Q    Did you ever recommend Alta Sales to any
customers?

        A    If I did, it was probably very rare.  I don't
recall of recommending them.

        Q    Were you dealing with customers at that time
period?

        A    Most of my customers at that time were being
deviated out to all of the brokers.  Dominantly, what I was
doing at that time was trying to get, ninety percent of my
time or more, was getting Neil Grassoff or public.  And the
other ten percent of the time was compliance work with the
customers that we already had.  So I probably had, if I had
any customers, I had very, very few.

        Q    Did you ever execute any trades in Alta Sales for
any customers?

                BAYLEY REPORTING, INC.
                   (202) 234-7787

GRAUBARD DECL. EX. 31                                    SEC214

58

A    I don't recall.  Again, if I did it could not
have been more than a hand full.

Q    Did anyone at Hubert Rosche recommend Alta Sales
to any customers?

A    Sure.

Q    Who?

A    The brokers at the time.

Q    All of them.  All of the ones that you previously
named.

A    Yes.  That was them.

Q    Did any of the brokers execute any trades in Alta
trade customers?

A    Yes.

Q    Do you remember the names now of any of the
customers?

A    Customers?  It was a long time ago.  Unless you
mentioned some names to me.

Q    Did you generally see all of the order tickets
that went through?

A    I was in that chain of seeing the order tickets.
 Jim Berg would see the order tickets.  I would see the
order tickets.  And then it would be faxed to Lynn Schultz,
who would execute the trade.

Q    As a general matter, was there a large amount of
other buying or selling in Alta Sales during this time

GRAUBARD DECL. EX. 31                                    SEC215

following the Ray Irangy meetings?

     A    What do you mean by large amount?  Well, during that time, we basically -- our policy at Hubert Rosche was that besides doing the general New York Stock Exchange in NASD internet issues, we would concentrate on one deal at a time.  We wouldn't concentrate on three different promotions of over-the-counter stocks at a time.  So during that time, May period and onward, we -- well, I believe concentrated on Alta Sales and that took place between one and two months and then we stopped.  And during that time we also started to do Neil Grassoff which occupied all of my time.

     Q    The brokers at Hubert Rosche were recommending Alta.

     A    Yes.

     Q    And you were seeing new order tickets.  Where you seeing sales in Alta Sales?

     A    Yes.  A purchase in the sales, by themselves.

     Q    In terms of the amount that you saw going through on the order tickets.  Would you characterize your efforts to recommend Alta Sales as successful?

     MS. FRITZ:  I would only suggest that because it was a while back and I think you have documents as to what the volume actually was.  I do not know whether there is a purpose served in testing the recollection as opposed to just reviewing the actual trading.

BAYLEY REPORTING, INC.
(202) 234-7787

**GRAUBARD DECL. EX. 31**                                               **SEC216**

60

MS. AVAKIAN:  Yes.  I would like to get Mr. Shainberg's recollection of just, in general, whether it was a successful recommendation.

MS. FRITZ:  In terms of volume.

MS. AVAKIAN:  Exactly.

MS. FRITZ:  Oh.  You mean in terms of whether the price went down?

MS. AVAKIAN:  No.  In terms of volume.

THE WITNESS:  I don't recall how many tickets were done and I certainly don't recall how much money we raised.  I certainly know that right after that we were recommending Neil Grassoff.  We were successful in raising $2 million over a three month period.  Prior to that, doing Alta Sales, it was a lot less than $2 million.  I mean if you want to figure $100,000.00, $200,000.00 worth of stock, it was a $6.00 stock.  Maybe some of the trades, we had done at five and four.  It could not have been that much.  You want a figure, I have no idea.

MS. FRITZ:  Do not guess.

THE WITNESS:  I have no idea.

BY MS. AVAKIAN:

Q    Do you have any recollection at all?

A    I have no idea.

BY MR. JOHNSON:

Q    I think what she is getting at, is what is your

BAYLEY REPORTING, INC.
(202) 234-7787

general recollection about whether this was a positive or
negative endeavor in terms of what your goal was.

    A    We didn't have goals.  We were just selling it.
I mean my goal was to make commissions and keep as many
customers happy and hopefully the stock goes up.  You know,
you recommend something to a lot of different people.  If
the stock goes up, please start buying more and more.  But
was it a success?  It was a moderate success.  I guess.

        BY MS. AVAKIAN:

    Q    Did you have any feedback from Ted McKay?

    A    In a question, no.  In what form of a question?

    Q    Did he ever comment on either how much of Alta
you were selling?  How little of Alta you were selling?

    A    He wasn't positive or negative, or had criticism.

    Q    Did he ever say, you are not selling enough?
Sell more.  Anything to that effect?

    A    No.  I don't think so.

        BY MR. JOHNSON:

    Q    Did he show any interest in Alta after that first
meeting?

    A    Yes.  In the second meeting.

    Q    I am sorry.  After the second meeting.

    A    We would have a weekly meeting.  He would ask me
those questions, what were you doing that he knew based upon
the trading.  Are you having any problems?  Are the

62

customers receptive?  That's what he would ask of all the

stocks. But he understood after that point that I was

concentrating my efforts on Neil Grassoff, where regardless

of whether he was interested in how much money my branch was

going to raise.  We had a very corporate interest in making

sure that deal gets through.  Which it did.

       BY MS. AVAKIAN:

    Q   You said that all the reps were recommending Alta

Sales.  Did Mr. Doyle personally recommend Alta Sales to any

customers?

    A   I believe so.

    Q   Did he conduct any trades in Alta Sales for any

of his customers?

    A   I believe so.

    Q   Did Mr. Lipkin personally recommend Alta Sales to

any of his customers?

    A   I believe so.

    Q   Did he conduct any trades in Alta Sales for any

of his customers?

    A   Yes.

    Q   After the second meeting, did you ever meet, see

or speak with Mr. Irangy again?

    A   I don't recall meeting him again.  It's possible

that he might have called up Ted McKay.  Ted McKay was known

to put people on conference calls.  So it's possible we

                    

63

might have had a conference call.

Q    Do you have any specific recollection of any other calls?

A    No.  I don't.

Q    After the second meeting, did Mr. McKay ever mention Ray Irangy's name to you again?

A    Outside of talking about Alta Sales on a weekly meeting, I don't think Ray's name came up.

Q    Who at Hubert Rosche in this time period, handled new accounts?  Or account openings situations.

A    That would generally be at Securities Planners. That in general would be an overall that I would undertake, and Michael might have undertaken on occasion, as also being the principal of the firm.  If I wasn't on the premises, he would supervise the opening of an account.  There were sometimes in a rare occasion that Lynn Schultz had to come down because we were both out on vacation.  And that happen once or twice for a two day period.

Q    What was the process when someone wanted to open an account?

A    The broker would take down the information on a new account form.  I would review it, or Michael would review it.  It would generally be myself, sign as a supervisor and fax that over to, as well as send that over to Securities Planners.  That form would evidently be sent

GRAUBARD DECL. EX. 31                                      SEC220

64

shortly, like within the day thereafter, to the customer for
his signature.  It would be sent back to Securities Planners
and they would file that and we would get a copy of the
completed form with the customer's signature on it.  Of
course if it was a corporate account, you'd have several
other documents.

Q    Was it ever forwarded to Quintella at any point?

A    The only time I can recall Quintella receiving
new account forms was if there was a problem.  With a new
account, I know that initially Quintella & Company approved
a form that Securities Planners had, that Securities
Planners would receive these forms which were handwritten by
the reps and they would then transcribe that over a
computer, a down main computer to Quintella & Company.
Quintella & Company made a lot of mistakes in the spellings
of names and addresses which caused a lot of confusion.
This was like the first month or two that we were associated
as a branch with Securities Planners.  Subsequently, they
changed their form and they did not require, but they
suggested that we typewrite this on another form.

Q    When you or the broker, or whomever took the new
account information from the customer, what if anything, was
done to verify information such as their address, social
security number, or whatever?

A    Very often Jim Berg would call the customer to

BAYLEY REPORTING, INC.
(202) 234-7787

65

verify that.  Most of the verification would come from the
customer himself.  The form would be sent to the customer
for his signature.  If it came back with the customer
changing the name, address, social security, or whatever and
then sign it, obviously that was the wrong information.  It
didn't happen too often after that first month of erroneous
computer down link communication.

        Q    If you had a customer with an address outside of
the United States, would anything else be done that wasn't
normally done?  Meaning in terms of verification or anything
else.

        A    No.  That was standard.  The only time that we
would have problems, not necessarily problems, but beyond
the phone call, would be when you have a corporate account,
an institutional account, and then you would have to get
corporate resolutions.  If it was a margin account, you
would have to get certain agreements and we'd be more
careful to make sure those documents are -- as careful as
before, but we'd have to do more work than just a simple new
account form.

        Q    In terms of when customers were buying Alta Sales
stock through Hubert Rosche or Securities Planners, did you
ever have any understanding as to where the stock that they
were buying was coming from?

        A    We'd process the tickets with Ted McKay and Lynn

GRAUBARD DECL. EX. 31                                            SEC222

66

Schultz and he would get the stock.  He would do the transaction.

Q    Did you ever have any knowledge as to where they were getting the stock?

A    Well, apparently Ted McKay worked with market makers of a lot of the -- even though he wasn't a market maker himself, that his trader, Lynn Schultz do all the market makers, all the institutional firms.  That was their job.

Q    But did you ever know where any of the stock was coming from?

A    You mean as a market maker?

Q    Sure.  Meaning any specific trade or any specific market maker, any brokerage house, any customer.

A    I probably wouldn't know the answer to that, unless there was another market maker that I was introduced to.  No.

Q    But do you know of any right now?  Do you have any recollection of any where that any of the stock came from?

A    It came from the streets.  That's what I was told from other market makers and brokerage companies.

Q    You say that was what you were told.  Did you ask someone where the stock was coming from?

A    Ted McKay said it came from other brokerage

BAYLEY REPORTING, INC.
(202) 234-7787

67

companies and that's where normally stock comes from.  Not from private transactions or private placements.  If there was a private placement or a public offering, I would have known about, or found out about it.  So I have to assume that it came from other brokerage companies that made markets.

Q    Did Hubert Rosche have the ability to match customers transactions?  Meaning if you had one customer buying stock X and one customer selling stock X, were you able to match them up?

A    You mean cross the trade?

Q    Yes.

A    We would be able to cross a trade only through Securities Planners.  So if we had customer A who wanted to buy stock at six, and a customer B who wanted to sell the cross of stock at six, but the offering is six and a half, and we didn't want to buy the stock at six and a half because he wanted a better price, and both getting the same price, then Securities Planners would most often agree to those.  As long as the customers are happy.  Certainly the customers buying it for a quarter point less.  He didn't buy it on the street.

Q    In instances when that would occur, did you know about it?

A    I would find out about it.

68

Q    Would you have to tell, or did you have to tell Securities Planners?

A    Oh.  They would do the transactions.  We were told various terms of our Securities Planners that there is a cross trade and Securities Planners would execute.  Yes.  They would know every transaction we took.  That it was a cross verses just the buy.

Q    Right.  Who in Hubert Rosche's office would determine that there was a cross transaction occurring and flag it to Securities Planners?

A    Jim Berg basically was the operations manager and he would identify exactly the format of the transaction.  He generally would talk as well as transcribe that information to Lynn Schultz so there was not an error occurring afterwards.

Q    Did the brokers ever know about this kind of stocks?

A    The brokers would find out about that, only in that when they gave an order to buy the stock.  It takes six by six and a half, at six and a half, but they would get it at six and a quarter.  I guess that they would be happy about that over another customer who wanted to sell the stock at $6.00 because that was the bid price.  We get six and a quarter, they would be happy about that.  They would say, well we got a better price because the trader was able

GRAUBARD DECL. EX. 31                                    SEC225

69

to do it, or there was a cross trade on the market.

Q    You said Mr. Berg generally handled that kind of
process.

A    Yes.  There was an operational issue.

Q    Did you ever handle anything like that?

A    I'd find out about it.  But I wouldn't handle
trades.

Q    Did cross transactions ever occur in the in the
sense of Alta Sales?

A    It's possible.  But I would have to see the
transactions to --

Q    Do you have any recollection of it ever
occurring?

A    I know that there was a customer who did a cross
transaction, Jimmy Berg had mentioned that to me.  I don't
know who the customer is.  I don't know.  I'd have to check
the record.

BY MR. JOHNSON:

Q    Before, we were talking about where the Alta
stock came from that was sold to your customers.  Did you
have any understanding, or did anyone ever tell you that Ray
Irangy played any role in getting stock to Securities
Planners or Hubert Rosche, that was sold to customers?

A    Generally, it is the role of a planner.  And I'll
be very specific to not only promote issues, but also to

BAYLEY REPORTING, INC.
(202) 234-7787

work with the market makers if they know they are playing a
role in retailing stock to work with the market makers.
Lets say there is half a point spread, to see if the market
makers will be willing to be not as greedy as they normally
are.  And try giving the best price of lock stock.  So I
assume that Ray had worked with the market makers to try to
get stock at a better price than six and a half.  Say maybe
six and three eighths or six and a quarter.  Because there
are occasions that we put in a purchase ticket and we are
able to get it at six and a quarter verses six and a half.
Or slightly less than the offering price.  So we assume that
either it was Ted McKays doing or Ray Irangys doing.  That's
a general role, not just promoting an issue.

    Q    You are stating that based on your general
understanding of the way that --

    A    I'm not aware of any specific instance that Ray
had said, here is a block of stock.  I got it from
Prudential, whatever and work at it at six and a quarter.  I
am not aware of any specific instant.

        BY MS. AVAKIAN:

    Q    Did Ray Irangy have an account with Securities
Planners?

    A    I was told that by Ted McKay, but I'm not aware
of the exact -- I would have to look at the documents again.
 But I believe he did have an account.  Yes.

        BAYLEY REPORTING, INC.
          (202) 234-7787

        SEC227

71

Q    What did Ted McKay tell you?

A    That he had an account at Securities Planners.

Q    When did he tell you that?

A    This was after the second meeting.

Q    You mentioned earlier that about a month later the stock price of Alta dropped.  Was it before or after the drop in stock price?

A    I don't know.

Q    What do you recall about the stock trend in Alta Sales?  The price trend.

A    During that period of time, they were promoting it.  The price stayed the same.  In fact, I think it went up a half a point.  A month later or so, the stock started to go down slowly and then we limited, dramatically limited, our involvement in retailing the issue.  And then the stock collapsed after that.  We were not promoting it at all at that time.  So it went from like six to five.  And we basically stopped promoting the stock.  Then it collapsed to like a dollar.

Q    So in the period when it was six to five, Hubert Rosche slowed down on the recommendation.

A    We started to slow down.  Yes.

Q    Where was the price when you stopped recommending it?

A    I'm not sure but it must have been between funds.

GRAUBARD DECL. EX. 31                                      SEC228

Once we see stock going down by twenty percent, we look for another stock.

Q    Who at Hubert Rosche handled Mr. Irangy's account?

A    I'd have to look at the records.

Q    Did you handle it?

A    No.  I would sign the supervisory, you know, the signature on most of the accounts, but I don't believe I -- if I would have handled it, I would be speaking to Ray Irangy.

Q    The stock you meant has previously been marked as Exhibit Number 68 and it is marked with the Securities Planners at the top.  It appears to be an account opening form.  Could you please take a look at that and tell me if you recognize that document.

A    Yes.

Q    It is a three-page document.  Do you recognize this document, Mr. Shainberg?

A    Yes.  It is a Securities Planners new account document.

Q    Okay.  And you are referring to page one of the document now.

A    Correct.

Q    What does page one of the document indicate?

A    It indicates that Ray Irangy of London, England,

BAYLEY REPORTING, INC.
(202) 234-7787

86

one on the 12th.

THE WITNESS:  Well, there are occasions, as I
mentioned before, that now you have 200 packages out to 200
potential customers but you do not recommend it anymore.
Somebody is going to call you up and say you know something,
I like the stock; let me buy it.  And they found out it was
six, they were recommended at five or four, now it's three,
and they want to buy it.  So those transactions will happen.

BY MS. AVAKIAN:

Q    So once it was down around three and below, is it
your assertion that your reps were not really recommending
it anymore but the people were calling and buying it on an
unsolicited basis?

A    I can't really tell you exactly what date but --

MS. FRITZ:  And I suggest there really appears to
only be three transactions after that, three buy
transactions.

BY MS. AVAKIAN:

Q    Well, on that page, yes.  But then flipping to
the next page, we have buys on June 13th at two and three-
quarters.  We have buys down on June 27th at three and an
eighth.

A    You are looking at a ratio of sales to buys --

Q    Yes.

A    -- ten to one.

BAYLEY REPORTING, INC.
(202) 234-7787

87

MR. JOHNSON:  I think for a minute let us just --
we are getting into conclusions --

THE WITNESS:  Yeah.

MR. JOHNSON:  -- as opposed to facts and I think
we would like to really --

MS. FRITZ:  Okay.

MR. JOHNSON:  -- stick with what happened.

THE WITNESS:  There was an occasional purchase
after that period of time.

MS. AVAKIAN:  Okay.

BY MS. AVAKIAN:

Q    Now, it appears as though on June 13th Brook
Adams Consulting starts selling Alta Sales stock.

A    I would like to explain something here which we
have not picked up on, which I think is going to solve your
entire issue.  You have several columns:  date; name; type
of transaction, buy or sell; shares; price, amount of money
that -- let us say somebody bought a thousand shares at
$5000; name of security.

When you have under shares -- let's look at the
first transaction, 500.  That means there was a purchase of
500.  But if you go down to buy, under the buy/sell, "buy
C," that transaction was cancelled.  No transaction took
place.  There are after --

Q    So you are referring to June 8th.

GRAUBARD DECL. EX. 31                                    SEC231

88

A    That's correct.

Q    Okay.

A    During that time, if you look at several of the purchases, you will see buy C, buy C, buy C.

Q    Yes.  I believe there are three on the whole chart that are cancelled.

A    That's correct.

Q    Okay.

A    That's all I just want to say, that there were --

Q    So three people cancelled their orders.  Any recollection of those cancellations?

A    No, just by looking at the names.  And -- I'm sorry.  One of them was a cancellation of a sell, as well, by Brook Adams.

       BY MR. JOHNSON:

Q    I just want to clarify the ceasing of the recommendation.


A    I understand.

Q    How did that occur?  Was there an instruction by someone that on any particular day, regardless of when it was, but that we should stop doing this; or did people do it on their own?  How did that happen?

A    It is -- generally always is -- a joint discussion when a stock goes down by the people who work

GRAUBARD DECL. EX. 31                                SEC232

street, in my opinion.

MS. FRITZ:  Purchases from the street and then
sales to.

THE WITNESS:  That's correct, sales to the
street.

BY MR. JOHNSON:

Q    Why do you say that you think they were purchases
from the street?

A    If they were cross trades of Joseph Reath and
Thomas Papazooklo were going to trade stock together, cross
a trade, and one was done on the 22nd and one was done on
the 25th, then I would say that it's possible it was into --
in and out of inventory or crossed the same day, certainly.
 But because all of these transactions were done weeks
before Brooks -- and I see Ray Irangy's name, as well -- did
their sales, it would be impossible to do that transaction
unless Securities Planners was a market maker and they held
stock in inventory.  And I was not aware that they ever did
so.

MS. FRITZ:  I think he appreciates your analysis
of what you are seeing but he is also pressing for whether
you independently have any recollection of there being any
cross trades on this.

THE WITNESS:  No, I do not.

BY MS. AVAKIAN:

92

Q    Looking as one example at the bottom of the first page, the first Brook Adams sale, which is on June 13th, --

A    Uh-huh.

Q    It is for a thousand.  The same day of Christopher Hebb buying a thousand.  Additional, the same day of Brook Adams selling 2600 and Herman Treakler buying 2600.

A    That's possibly a --

Q    Is that possibly a cross trade?

A    It's possible, absolutely.

Q    Do you have any independent recollection of that being a cross trade?

A    No, I don't.

Q    I will also represent to you that Ray Irangy -- from this chart it is indicated that he sold 59,550 shares of Alta.  Do you have any independent recollection as to whether any of his sales were cross trades with any of Hubert Rosche's buyers?

A    I don't have any independent recollection of that.

Q    Did you know before today that Ray Irangy was selling Alta Sales?

A    I might have seen the tickets that I'm looking at now but it did seem important at the time if I did know it.

One of the things I'd like to bring to your

BAYLEY REPORTING, INC.
(202) 234-7787

**GRAUBARD DECL. EX. 31**                                    **SEC234**

attention is that -- if at the same time one customer or two
customers was selling a dramatic amount of stock and 80
customers were buying it, I'd feel a little -- I would
certainly question that.  But from this document -- and
obviously this happened.  It's your document.  If these
customers bought it at a higher price but the Brook Adams
and Ray Irangy sold it at a dramatically cheaper price, sold
it at a dramatically cheaper price --

       MS. FRITZ:  Perhaps two exceptions are here.

       THE WITNESS:  With two exceptions.  So that would
seem that if anything, why didn't they sell it at a higher
price; why are they selling it at cheaper prices.  So that
probably didn't cause me any concern.  If they were all
crossed, or most of them crossed at the same price, then
maybe I would have wanted to know what's going on and who
are these people and what's going on.

       BY MR. JOHNSON:

    Q    Do you recall a time when either Brook Adams or
Ray Irangy was either buying or selling Alta Sales when the
brokers were all recommending that their customers do the
opposite?

       MS. FRITZ:  When brokers were recommending sales
but Brook was --

       THE WITNESS:  No.  Brokers were recommending
buys.

GRAUBARD DECL. EX. 31                                        SEC235

99

transaction, second column, if it was a short, it would
probably say not sell but a short open transaction.

Q    Now, underneath where it lists the security that
he sold, Alta Sales Co., it says "new" at the end.  What
does that mean?

A    New would be the new name of the stock, or new
cusip number of the stock, something of that nature.

Q    Okay.  Now, underneath the name of security it
says "agent for both buyer and seller."  What does that
mean?

A    That -- agent for both and seller.  That would
mean one or two things.  Either it was a cross trade or the
-- that would generally mean it's a cross trade.  Yes.

Q    Now, would it mean that Hubert Rosche is the
agent for both buyer and seller?

A    Not necessarily.  It would mean that Hubert
Rosche or Securities Planners.  Securities Planners had a --
since this was Quintella representing the whole of
Securities Planners and all its branches, it could very
possibly mean that the account that this stock sold out of
went into a purchaser account, not necessarily a Hubert
Rosche but within the Securities Planners family.

Q    So it could be either Hubert Rosche or any other
branch within Securities Planners.

A    That is correct.

                    BAYLEY REPORTING, INC.
                       (202) 234-7787

Q    There is a number indicated right under where it says agent for both buyer and seller and it says "customer ac."

A    Uh-huh.

Q    What is that?

A    That's the account number of the customer that it was probably crossed to.

Q    Okay.  Is there any way to determine from that account number the branch of Securities Planners that that customer was at?

A    Well, 341 was the Hubert Rosche branch and I see that here.

Q    There appear to be eight sell transactions on the page that we are referring to now.

A    Uh-huh.

Q    Out of those eight transactions how many of them are not indicated agent for both buyer and seller?

A    They're all indicated buyer and seller.  Hold on.

Q    With the exception, I believe, of --

A    Of one?

Q    Yes.

A    Yes, there is one here.

Q    The 6/19/95 --

A    Correct.

Q    -- sell for 5000.

BAYLEY REPORTING, INC.
(202) 234-7787

113

would have to have it.  Securities Planners would have to

have it.  Quintella and Company would generally have it but

they don't have to have it, but they generally would.

At the time we had the branch office of

Securities Planners.  I had it, as well.  But I don't have

it anymore.  That's why my request to find out who 361 is.

Q    During the period June through the end of August,

'95, I will represent that Ray Irangy sold just under 60,000

shares of Alta Sales.  Now, with you reviewing the order

tickets, was there any point in time that you thought hey,

here is Ray Irangy promoting this stock, now he is selling

it?

A    Well, obviously it didn't cause me a dramatic

concern, reference what I said before, because he was not at

the same time as we were promoting it, selling it.  He was

obviously selling it after we stopped promoting it.  So I

must have assumed at the time that he had stock with our

firm, totally legal, no conflict of interest.  Not that I

was thinking of it at the time; I'm thinking of it now.  But

the man saw that we weren't promoting it anymore.  I have to

assume that he had gone to other companies, as he said, to

promote his issue.  And as the price went down -- in my

assumption, the price went down not because we stopped

promoting it, because everybody stopped promoting it.  But I

have to assume he knew that and he said well, the stock's

GRAUBARD DECL. EX. 31                                    SEC238

going down, nobody is promoting it anymore, at least to his satisfaction; maybe I'll sell the stock that I have, that I have gotten.  How he got it, I don't know.  And he sold it at very cheap prices compared to what the customer sold it for and by not crossing it to the customers except on certain occasions, if there were crosses, and not Brook Adams.

    Q   Do you know if there was a time when the customers started selling it, aside from Ray Irangy and Brook Adams?

    A   I remember there was a very few transactions of sales.  Most of these customers -- I know we stopped soliciting the purchase at a certain time that I mentioned before.  But very few of these people, because it dropped so dramatically, had an interest in selling at a huge loss, and I had to take the phone calls on those.

    Q   Do you know what it is trading at today?

    A   I have no idea.  I haven't looked at the price of the stock or the stock in a long time.

    Q   The first trade date indicated on the list that I showed you before is May 15, '95, --

    A   Uh-huh.

    Q   -- where one of Hubert Rosche's customers is buying.  And then a month later is when Ray Irangy starts making his first sales, which is June 14, '95.

115

A    Uh-huh.

Q    That is a trade date.  Did you at any time go to
Ted McKay or anything and say, hey, we just started
promoting this like a month ago and Ray Irangy, the guy who
is promoting it, is selling it?  I mean did you and
Ted McKay ever talk about this?

A    I don't recall any conversation.  Again, the -- I
don't know.

MS. FRITZ:  Did you talk to McKay about the
precipitous drop in the price?

THE WITNESS:  Yes, I did do that.

MS. FRITZ:  And then separately, I think she is
also asking did you mention Ray selling it, also?

THE WITNESS:  I don't think we talked about it.

BY MS. AVAKIAN:

Q    So you discussed the drop in the price with McKay
but you never discussed Ray Irangy selling it --

A    That's correct.

Q    -- to McKay.

A    That's the best of my knowledge.

MS. FRITZ:  Another point I want to make:  To
what extent do you recall specifically seeing the sale
activity of Ray Irangy?

THE WITNESS:  It must have come across my desk at
the time.  The reason, again, it did not make a light bulb

GRAUBARD DECL. EX. 31                                    SEC240

go over my head is because it did not seem to be a problem.
He sold it after we really stopped promoting it and at a
much cheaper price than we were selling it at and were not
cross sales dramatically.  It didn't seem like a conflict of
interest.  The reason I --

        BY MS. AVAKIAN:

    Q    Yes, I understand your point.  But compliance
issues aside, I am just wondering now did you just look at
it and say hey, this is the same guy that I met a month ago
or two months ago, whatever, who was saying buy, buy, buy
and now --

    A    As I mentioned before, we determined to seriously
stop promoting the solicitation of the stock before I sold
one ticket.

    Q    When did you first discuss with Ted McKay the
drop in price of Alta Sales?

    A    When it first dropped, which was a few weeks
after.  I believe it was about three weeks after.  I see
that it dropped dramatically -- it started really 10 days
later, 12 days later.  I must have had a conversation in my
weekly conversations, probably on the 30th, two weeks --

    Q    Of May, you mean?

    A    Yeah.

    Q    What was said?

    A    I just asked him what does he know about the

117

problem, why is the stock dropping.

    Q   What did he say?

    A   I don't recall.  I mean generally, unless he said something very specific about lost contract, shorts coming into the market or something like that, he probably just said he doesn't know.  I mean nothing in particular that would make me remember what he said.

    Q   Any other conversations about Alta Sales with Ted McKay?

    A   Just that.  I mean is the information you gave me still current?  Yes.  Is there anything else I need to know, any more newspaper articles and news releases, or whatever, you want to show me?  That was it.

    Q   Did you ever have any customers calling and saying hey, what happened?

    A   After the first few weeks they asked us and we said nothing.  We said you win some, you lose some, you know.  It's not likely we're selling a thousand shares a day and it was a thousand share volume.  You know, there were other market makers, there was a lot of volume on it, apparently, and --

    Q   When the customers started calling and complaining did you --

    A   I only recall two or three people.

    Q   Okay.  Well, when that happened did you go to

GRAUBARD DECL. EX. 31                                    SEC242

118

McKay at that time and say --

    A    Sure.

    Q    What did you say then?

    A    I said the stock is $3.00 or whatever, you know, it's one of those weeks; we can't promote this anymore even if the fundamentals are getting better.  And I must have told him that we had one or two customer complaints, which I always do when we do get customer complaints, certainly of this nature when a stock goes down dramatically and we have to stop doing it.  And he said do what you want; you don't have to promote it.

    At that time my head also was into and my activity was mostly into getting the -- completing Neil Grassoff's secondary offering.  I just did not want to occupy myself with problems.

    Q    Just looking at the first page of the chart, starting on May 15th it appears that at least, I guess the ask was at $6.00 and then down by June 13th it was at two and three-quarters, which is about a month's time.

    Just in your general experience, is this type of drop something that you had experienced prior to this occasion?

    A    No.

    Q    About how many years were you in the business before May 15, '95?

    A    Over 10.

GRAUBARD DECL. EX. 31                                        SEC243

119

Q    And because this was the first time in 10 years
that you had experienced this type of drop in this time
period, did this stand out in your mind?

A    Sure.

Q    If any, what impressions did you form about the
trading pattern in Alta Sales stock at that time?

A    Well, I didn't see it go down in one day, as I've
read about in the newspapers.  So I didn't formulate an
impression that there was a major short that just came in.
I didn't see any bad news on the company so I didn't come to
the impression that they lost the contract or the president
quit.  I just assumed that either the promotion of the issue
by the company, or by the company's representatives, or by
Ray in this case, was not going well, or the market makers
were not happy.

You're asking me why stock goes or down.  We just
stopped doing it.  I mean the stock goes down; you don't
want to continue to do it.

Q    Did anyone from --

A    The brokers didn't want to do it anymore, so we
had to stop doing it.

Q    Did any of you from Securities Planners, meaning
the Hubert Rosche office, Ted McKay, anyone, ever call Ray
Irangy and say hey, what's going on with this stock that you
were hyping?

BAYLEY REPORTING, INC.
(202) 234-7787

120

A    I never called Ray Irangy and asked him that but I certainly spoke to Ted McKay about that.

Q    And what did Ted McKay say?

A    He didn't say anything.

Q    Did he say he spoke to Irangy about it?

A    I don't recall if he said that or not.  It's very possible he did call.  I would assume that he might have called everybody on the street but I don't recall.

BY MR. JOHNSON:

Q    What was your impression of Ted McKay at that point in that did he share your concerns about the drop in price?

A    Absolutely!

BY MS. AVAKIAN:

Q    Did he seem as concerned as you about the drop in price?

A    He always came across to me as a very serious person.  I cannot answer that.  By looking at his face and hearing the tone of his voice, of course.  But I don't think he was as concerned as I was and not as concerned as my brokers were because they were dealing with this every day, every minute.

Q    Did you ever have any opinion or feeling, anything, that Ted McKay received some type of compensation from the sales of Alta Sales other than commissions?

BAYLEY REPORTING, INC.
(202) 234-7787

121

A    No.

Q    Ever heard any rumor to that effect?

A    No.  And if I did, I would have left that company a lot sooner.

Q    Did anyone ever guarantee you or Hubert Rosche against any loss in Alta Sales?

A    No.

Q    Did anyone promise you anything of value for trading in Alta, trading your customer in Alta?

A    Outside of our agency commissions, nothing.

Q    Did you ever receive anything of value for selling Alta other than ordinary commission profits?

A    No, I did not.

Q    Did you ever know anyone other than Ray Irangy who was affiliated with Alta in any manner?

A    No.

Q    Ever know any investment bankers, consultants, anything affiliated with Alta Sales?

A    No, I do not.

Q    Have you ever heard of Grant Curtis?

A    No.

Q    Have you ever heard of Donald Kessler?

A    No.

Q    Have you ever heard of Leo Mangum?

A    No.

GRAUBARD DECL. EX. 31                                                          SEC246

122

Q    Have you ever heard of Timothy Masley?

A    No.

Q    Have you ever heard of Nick Morf?

A    No.

Q    Have you ever heard of Pedro Gomez?

A    No.

Q    Have you ever heard of Kyle Martino?

A    No.

Q    Have you ever heard of Domingos Carlos?

A    No.

Q    Have you ever heard of Habib Capital?

A    No.  That's a corporation.  Right?

Q    Yes.  Did you ever do any work for anyone regarding Alta Sales?

A    No.

Q    Were you ever introduced to any other business dealings through any connections you made through selling Alta Sales?

A    I have no idea.  I don't think so.  It could have been one of Ted McKay's business connections.

        BY. MR. JOHNSON:

Q    We were talking earlier about Brook Adams Consulting.

A    Uh-huh.

Q    Do you know what they did, who they were?

BAYLEY REPORTING, INC.
(202) 234-7787

123

A    It was a company that was "repped" by --
represented by an attorney.  Apparently, that attorney
represented many different companies.

Q    Do you know what they did, what Brook Adams did?

A    I have no idea.  They were a manage and
consulting company.

Q    Do you have any impression that there is any
connection between Ray Irangy and Brook Adams Consulting?

A    I have never formulated that impression.

Q    Did anyone ever say that to you?

A    No.

BY MS. AVAKIAN:

Q    Just some background questions:  What is the
address of your present primary residence?

A    385 Grant Street.

Q    New York?

A    Yes.

Q    And the zip?

A    10002.

Q    Any other residences?

A    That's it.

Q    How long have you lived there?

A    I have lived there on and off since I was -- for
35 years.

Q    Does anyone live with you?

BAYLEY REPORTING, INC.
(202) 234-7787

143

THE WITNESS:  I don't think I have a -- I'll look for it but I don't think I have a list.

MS. FRITZ:  If he can locate it, I'll enclose it.

MR. JOHNSON:  Okay, great.

MS. AVAKIAN:  It is now 1:50 p.m. and we are off the record.

(Whereupon, at 1:50 p.m., the hearing was concluded.)

GRAUBARD DECL. EX. 31                                    SEC249

144

<u>U.S.</u> <u>SECURITIES</u> <u>AND</u> <u>EXCHANGE</u> <u>COMMISSION</u>

<u>REPORTER'S</u> <u>CERTIFICATE</u>

I, <u>Eric</u> <u>Payne</u>, reporter, hereby certify that the foregoing transcript consisting of <u>143</u> pages is a complete, true, and accurate transcript of the testimony indicated, held on                <u>September</u> <u>5,</u> <u>1996</u>
at                <u>New</u> <u>York,</u> <u>New</u> <u>York</u>
    In the matter of: <u>Trading</u> <u>in</u> <u>the</u> <u>Securities</u> <u>of</u>
                <u>Organogenesis,</u> <u>Inc.</u> <u>and</u> <u>Certain</u> <u>other</u>
                <u>Issuers</u>

            I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

Date:  <u>September</u> <u>19,</u> <u>1996</u>

Bayley Reporting, Inc.
(202) 234-7787

**GRAUBARD DECL. EX. 31**                                    **SEC250**

145

Official Reporter

Bayley Reporting, Inc.


PROOFREADER'S CERTIFICATE


In the Matter of: Trading in the Securities of Organogenesis,

Inc., and Certain other Issuers

Witnesses:        Joshua Shainberg

File Number:      NY-6315

Date:             September 5, 1996

Location:         New York, New York


    This is to certify that I, Nestor Blanco (the
undersigned), do hereby swear and affirm that the attached
proceedings before the U.S. Securities and Exchange
Commission were held according to the record and that this is
the original, complete, true and accurate transcript that has
been compared to the reporting or recording accomplished at
the hearing.


                                September 19, 1996

  (Proofreader's Name)

  (Date)


**Bayley Reporting, Inc.**
**(202) 234-7787**


**GRAUBARD DECL. EX. 31**                          **SEC251**

146

GRAUBARD DECL. EX. 31                                    SEC252



UNITED STATES
### SECURITIES AND EXCHANGE COMMISSION
NORTHEAST REGIONAL OFFICE
7 WORLD TRADE CENTER
NEW YORK, N.Y.  10048

WRITER'S DIRECT DIAL
(212) 748-8261

August 7, 1997

**VIA FACSIMILE TO 212-856-9494
AND BY FIRST CLASS MAIL**

Maranda Fritz, Esq.
Fritz & Miller
565 Fifth Ave.
New York, NY  10017

> Re:     In the Matter of Trading in the Securities of Organogenesis,
> Inc. and Certain Other Issuers (NY-6315)

Dear Ms. Fritz:

I attempted to contact you earlier today to advise you that the staff of the New York Regional Office is considering recommending that the Commission authorize the filing of a civil injunctive action against your clients, Michael V. Lipkin and Joshua Shainberg, for violations of Section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5.  The staff is considering recommending that the Commission seek an order enjoining Mr. Lipkin and Mr. Shainberg from further violations of these provisions, requiring them to provide an accounting of the proceeds of their violative conduct and current assets, requiring them to disgorge the proceeds of their violative conduct plus prejudgment interest, and imposing penalties pursuant to the Securities Enforcement Remedies and Penny Stock Reform Act of 1990.  The staff is also considering recommending that the Commission authorize public administrative proceedings against Mr. Lipkin and Mr. Shainberg pursuant to Sections 15(b) and 19(h) of the Exchange Act to determine what remedial sanctions should be taken in the public interest as a result of the above violations.  In that conversation, I also invited your clients to make Wells submissions.

The contemplated action would allege that Mr. Lipkin and Mr. Shainberg participated in a scheme to defraud which involved their retailing the common stock of ICIS Management Group, Inc. (f/k/a Alter Sales Co., Inc.) in exchange for payments of undisclosed compensation.

**GRAUBARD DECL. EX. 32**                                    **SEC253**

Maranda Fritz, Esq.
August 7, 1997
Page 2

Enclosed for your information is a copy of Securities Act Release No. 5310, entitled *Procedures Relating To The Commencement Of Enforcement Proceedings And Termination Of Staff Investigations*. Also enclosed is a copy of SEC Form 1662, entitled *Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena*, copies of which were provided previously to your clients. If your clients wish to make written submissions to the Commission setting forth why they believe the proposed action should not be brought, or to bring any facts to the Commission's attention in connection with its consideration of whether to accept the staff's recommendation, you should forward the submissions to me no later than August 29, 1997.

In the event the staff makes an enforcement recommendation to the Commission on this matter, we will forward any submissions that you may make to the Commission. Be advised that the staff in many cases seeks to introduce these written submissions as evidence in Commission enforcement proceedings, when it deems appropriate, in accordance with applicable law and as explained in SEC Form 1662. Please also note that Wells Submissions may be discoverable by third parties in accordance with applicable law.

If you have any questions, you can reach me at (212) 748-8261.

Very truly yours,

Stephanie Avakian
Staff Attorney
Branch of Enforcement No. 4

Enclosures:     1)  Securities Act Release No. 5310
                2)  SEC Form 1662

**GRAUBARD DECL. EX. 32**                                              **SEC254**

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    --------------------------------------

5    SECURITIES AND EXCHANGE COMMISSION,

6           Plaintiff,

7      vs.                                                    INDEX NO.
                                                              CV 99 7357
8    GRANT R. CURTIS, LEO MANGAN, TIMOTHY
     H. MASLEY, JAMES W. NEAREN, RAIMOND
9    IRNI, PEDRO DIBRITO GOMEZ, DONALD E.
     KESSLER, DAVID R. BEHANNA, ANDREA VARSI,
10   JONATHAN D. LYONS, KENNETH A. ORR,
     LILLIAN M. VINCI, ANN MARIE NOEL,
11   MICHAEL V. LIPKIN, JOSHUA S. SHAINBERG,
     PHILLIP J. MILLIGAN and ROBERT L. SHATLES,

12          Defendants.

13   --------------------------------------

14

15          DEPOSITION of JOSHUA SHAINBERG, taken by

16    Plaintiff, at the offices of the Securities and Exchange

17    Commission, 233 Broadway, New York, N.Y 10007, on

18    Thursday, June 20, 2002, commencing at 9:40 a.m., before

19    Linda Fisher, a Certified Shorthand  Reporter and notary

20    public, within and for the State of New York.

GRAUBARD DECL. EX. 33                                              SEC255

2

```
1
        A P P E A R A N C E S :
2
        JACK KAUFMAN, ESQ.
3       BOHDAN S. OZARUK, ESQ.
        Attorneys for Plaintiffs
4       Securities and Exchange Commission
        233 Broadway
5     New York, New York 10007

6    JOSHUA SHAINBERG
     Defendant pro se
7    385 Grand Street
     New York, New York
```

4

1

2          JOSHUA SHAINBERG,

3     having been first duly sworn, was examined and testified

4     as follows:

94

3          Q.   Can you tell me how much, I may have asked

4     you this before, in total, you made, income you received

5     from Hubert-Rosche in 1995 net?

6          A.   A few thousand dollars, if any.  Maybe I

7     lost.

8          Q.   And what other sources of income did you have

9     in 1995?  If any.

10          A.   I may have had an inheritance that was coming

11     in, a small inheritance.

12          Q.   How much was that?

13          A.   Modest, a few thousand dollars.

14          Q.   A few thousand total?

15          A.   A few thousand total.

97

7        Q.  What other assets did you have in 1995 that

8    you haven't already described?

9        A.  I had more assets in 1995 than I have today.

10        Q.  What were those?

11        A.  Art that I was selling and putting money

12    into, and hopefully taking out from Hubert-Rosche to pay

13    the bills.  Rent, the phone.

14        Q.  Any other assets?

15        A.  No.

**GRAUBARD DECL. EX. 33**                                    **SEC259**